UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

|  |  |  |
|---|---|---|
| ANTHONY HINRICHS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | CASE NO. 1:05-cv-0813-DFH-TAB |
| BRIAN BOSMA, in his official capacity | ) | |
| as Speaker of the House of | ) | |
| Representatives of the Indiana | ) | |
| General Assembly, | ) | |
| | ) | |
| Defendant. | ) | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

Four Indiana residents and taxpayers have sued the Speaker of the House of Representatives of the Indiana General Assembly. They allege that most of the prayers the Speaker has permitted to open House sessions are sectarian Christian prayers, in violation of the Establishment Clause of the First Amendment to the United States Constitution. Such prayers are deemed government speech for purposes of applying the Establishment Clause. Plaintiffs bring this action under 42 U.S.C. § 1983.

With the consent of the parties, the court consolidated the trial on the merits with the hearing on plaintiffs' request for a preliminary injunction. The trial held on October 28, 2005 was devoted to argument on stipulated facts and

written submissions of evidence.  The court now states its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

To summarize, the evidence shows that the official prayers offered to open sessions of the Indiana House of Representatives repeatedly and consistently advance the beliefs that define the Christian religion:  the resurrection and divinity of Jesus of Nazareth.  The Establishment Clause "means at the very least that government may not demonstrate a preference for one particular sect or creed (including a preference for Christianity over other religions).  'The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.'"  *County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573, 605 (1989), quoting *Larson v. Valente*, 456 U.S. 228, 244 (1982).  The sectarian content of the substantial majority of official prayers in the Indiana House therefore takes the prayers outside the safe harbor the Supreme Court recognized for inclusive, non-sectarian legislative prayers in *Marsh v. Chambers*, 463 U.S. 783 (1983).  Plaintiffs have standing as Indiana taxpayers to bring their claims, and they are entitled to declaratory and injunctive relief.  This relief will not prohibit the House from opening its session with prayers if it chooses to do so, but will require that any *official* prayers be inclusive and non-sectarian, and not advance one particular religion.

*Findings of Fact*

I.    *The Indiana House of Representatives Prayers*

Indiana's legislative authority is vested in the Indiana General Assembly, composed of the Senate and the House of Representatives.  Ind. Const. art. IV, § 1. The House of Representatives consists of up to 100 members and meets in the Indiana Statehouse.  The House meets in the chamber of the Statehouse, which has seating for the Representatives and an observation gallery for about 75 to 100 members of the public.

House Rule 10.2 calls for a prayer or invocation prior to conducting business each meeting day.  The Indiana House of Representatives has opened each meeting day with an invocation for the last 188 years.  Jt. Stip. Facts (First) ¶ 28.  The invocation takes place after the Speaker of the House gavels the House to order and before the Pledge of Allegiance is recited.  *Id.* ¶ 1.  It is delivered from the Speaker's stand.  *Id.* ¶ 4.  Under House rules, no one may enter the Speaker's stand except at the invitation of the Speaker.  *Id.* ¶ 5; Cplt. Ex. 1 (Rule 15).

The invocation is frequently delivered by a religious cleric.  Jt. Stip. Facts (First) ¶ 2.  When no cleric is present, the invocation has been delivered by a Representative.  *Id.* ¶ 16.  The cleric for a particular day is nominated by a Representative who completes a "Minister of the Day" form specifying when the cleric is available.  *Id.* ¶ 3; see Jt. Ex. 18.  The Representative submits the form

to the Majority Caucus Chair, who then schedules the cleric to deliver the invocation.  Jt. Stip. Facts (First) ¶ 3.

Once scheduled, the cleric receives a confirmation letter by mail.  *Id.* ¶ 6; see Jt. Ex. 19.  This letter states in part:  "The invocation is to be a short prayer asking for guidance and help in the matters that come before the members.  We ask that you strive for an ecumenical prayer as our members, staff and constituents come from different faith backgrounds."  Jt. Ex. 19.  Neither the Speaker nor anyone else associated with the House provides any further guidance to the cleric as to the nature of the invocation.  Jt. Stip. Facts (First) ¶ 7; Bosma Aff. ¶¶15, 16.  Representatives receive no instruction as to the nature of the invocation.  Jt. Stip. Facts (First) ¶ 17.

When a Representative gives the invocation, there are no expenses for the invocation other than the normal expenses associated with operating the House.  *Id.* ¶ 18.  Additional modest expenses are incurred, however, when a cleric delivers the invocation.  All of these costs are paid from state taxpayer funds appropriated by the Indiana General Assembly.  *Id.* ¶ 31.  The cost of mailing the confirmation letter is $0.54 per mailing.  *Id.* ¶ 6.  After the cleric has delivered the invocation, he or she may receive a thank-you letter by mail.  *Id.* ¶ 11; see Jt. Ex. 21.  The cost of this is also $0.54 per mailing.  Jt. Stip. Facts (First) ¶ 11.

In addition, constituents and other persons can have their photographs taken with Representatives before the meeting begins, and these photographs cost $0.68 each to print.  *Id.* ¶ 8.  During the 2005 legislative session, the staff photographer took photographs of a number of clerics who delivered the opening prayers.  *Id.* ¶ 10.  The records show that 11 photographs of clerics were taken in 2005, but it is possible that there were more.  *Id.* ¶ 10; see Jt. Ex. 20.  When a photograph of a cleric has been taken, the usual practice is for the House staff to mail it with the thank-you letter.  Jt. Stip. Facts (First) ¶ 12.  If a photograph is sent along with the letter, the cost per mailing increases to $1.60.  *Id.* ¶ 13.

In 2005, each meeting of the House session was recorded and made available as streaming video on the Internet.  *Id.* ¶ 19.  To ensure that the video equipment was working properly, the streaming video would begin several minutes prior to the invocation.  *Id.* ¶ 26.  The streaming video for each invocation in 2005 was "a few minutes in length."  *Id.* ¶ 25.  The cost for the streaming video in 2005 was $112.85 per hour, or $1.88 per minute.  *Id.* ¶ 23.  Streaming video of future meetings will also be made available on the Internet.  *Id.* ¶ 19.

Speaker Brian Bosma has been a member of the Indiana House of Representatives since 1986.  Bosma Aff. ¶ 4.  He was elected by House members to serve as Speaker of the House on November 16, 2004.  *Id.* ¶ 5.  As Speaker, he does not routinely participate in selecting the cleric to perform the invocation, and he typically does not know the identity or faith of the cleric until minutes before

he introduces the cleric.  *Id.* ¶¶ 12, 13.  He is not informed in advance what the cleric or Representative will say in the invocation.  *Id.* ¶ 14.  Under House Rules, however, the Speaker has authority over the general direction of the chamber, and, as noted, no one may enter the Speaker's stand without his permission.  See Cplt. Ex. 1 (Rule 20.1, Rule 15).

Fifty-three opening prayers were offered in the House during the 2005 legislative session.  See Jt. Ex. 23.  Forty-one of those invocations were delivered by clergy identified with Christian churches; nine were delivered by Representatives; and one each was delivered by a lay person, a Muslim imam, and a Jewish rabbi.  Transcripts are available for forty-five prayers.  Of these, twenty-nine were offered in the name of Jesus, Jesus Christ, the Savior, and/or the Son. In the majority of these invocations, the officiant did not indicate that he or she was personally praying in the name of Jesus or Christ.  *Id.*  Some officiants explicitly stated that the prayer was offered for all those assembled or for persons other than the legislative body.  *Id.*

The substantial majority of prayers offered during the 2005 session were explicitly Christian in content.  Several examples illustrate the point.  The prayer of January 4th concluded:  "In the Strong name of Jesus our Savior, Amen."  Jt. Ex. 23 at 1.  The next session, the prayer concluded:  "And Lord God, we come before You because [of] what you have done for us through Your Son Jesus Christ.

It is in his name we do pray.  Amen." *Id.*[1]  The January 19th prayer concluded:
"We ask You to bless these leaders in the name of Jesus, Your Son, and our Lord
who reigns forever and ever.  Amen." *Id.* at 3.

The prayer for February 28th began with six verses from Paul's letter to the
Colossians, including this passage:

> Let the peace of Christ rule in your hearts, to which indeed you were called
> in one body; and be thankful.  Let the word of Christ richly dwell within
> you, with all wisdom teaching and admonishing one another with psalms
> and hymns and spiritual songs, singing with thankfulness in your hearts
> to God.  Whatever you do in word or deed, do all in the name of the Lord
> Jesus, giving thanks through him to God the Father.

Colossians 3:15-17.  The prayer concluded:  "I know that You have heard my
prayer, and I know that Your precious Son promised that whatever we asked of
You in Your holy name [You] will provide.  I ask for all these things in Your Son's
most holy name." Jt. Ex. 23 at 7-8.  The prayer of March 22nd ended:

> And for those who have lost family members in the current and persistent
> conflicts of the world, we ask that You would tenderly embrace them with
> the comfort of Your spirit, heal their pain in ways that only You can, by
> showing them the love You expressed in the sacrifice of Your Son Jesus
> Christ.  Now God, cause Your face to shine upon the men and women in
> this institution as they carry out Your call on their lives and fulfill Your will
> for this land.  While respecting those within the sound of my voice who may
> adhere to a different faith, I offer this prayer in the name of Jesus Christ,
> my Lord and Savior.

*Id.* at 11.

---

[1]The court has corrected some of the spelling, punctuation, and grammar
in the transcripts.

The prayer for March 28th included this prayer for worldwide conversion to Christianity:  "We look forward to the day when all nations and all people of the earth will have the opportunity to hear and respond to messages of love of the Almighty God who has revealed Himself in the saving power of Jesus Christ."  *Id.* at 12.

On April 5, 2005, Reverend Clarence Brown delivered the invocation.[2]  The prayer included the thanks:  "Father we are so gracious [sic – grateful?] to You for Your grace and mercy that You have allowed us to be able to have and Father I thank You for our Lord and Savior Jesus Christ, who died that we might have the right to come together in love.  Father, let us love one another as he has loved us."  The prayer concluded:  "I thank You in Jesus Christ's name.  Amen."  *Id.* at 13-14.  After the invocation and Pledge of Allegiance, Speaker Bosma reintroduced Reverend Brown, saying:  "I understand he has a wonderful voice and he is going to bless us with a song."  Reverend Brown proceeded to sing "Just a Little Talk with Jesus."  A number of the legislators, staff, and visitors present in the chamber stood, clapped, and sang along at the invitation of Reverend Brown.  Jt. Stip. Facts (First) ¶ 21.  This event prompted at least some members of the House to walk out because they believed the sectarian religious display during the

---

[2]Reverend Brown and a number of other Christian clerics have filed a brief as friends of the court supporting the Speaker's prayer practices.  The brief notes that it was funded in part by a grant from the Alliance Defense Fund, with the Indiana Family Institute as the grant sponsor.

legislative session was inappropriate.   See Quigley Dep. at 37-42; Hinrichs
Interrog. No. 6; Quigley Interrog. No. 6.

The prayer of April 18th ended:

Lord we ask You that whatever we do, whatever we say, whatever we write,
we do it in Your glorious name.  And now Lord we ask this in Your Son's
name, who is Lord of Lords, King of Kings, Jesus Christ, who gave us the
most precious gift of all, to die on the cross for our sins.  Thank You Lord.
Bless us all.  We pray in Your name.  Amen.

Jt. Ex. 23 at 16.  The prayer of April 20th ended:  "Lord thank You most of all for
Your Son Jesus, and the gift of salvation.  In Christ's name I pray.  Amen."  *Id.* at
17.

The prayer on April 29th was pervasively Christian in content:

Today on behalf of every man and woman under the sound of my voice,
every representative present in this house of government of the great State
of Indiana, I appeal to the God and Father of Jesus Christ, the God of
Abraham, Isaac and Jacob, the God of the whole earth, that He would find
not only a welcome here,  among those whom He has honored to allow to sit
in this place of authority, but also hearing ears and perceptive and
courageous hearts that would walk in the ways of righteousness, govern in
the way of justice, and make right choices. . . .  Let it be known today that
it is required in leaders that a man be found faithful.  That integrity is a
requirement of a leader, and that every Representative is a leader before
men and God. . . .  As a minister of the gospel, I exercise my right to declare
this room a hallowed place.  I invite into this room, into the proceedings of
the day, into the decisions that will [be] made today, to each person, the
mighty Holy Spirit of God.  Holy Spirit, give these here the mind of Christ
. . . I ask this in the name of Jesus Christ.

*Id.* at 20.

-9-

In addition to the many explicitly Christian prayers, the prayer for February 21st was generally inclusive but contained a feature especially offensive to Jews. The prayer used the Hebrew name for God, known as the Tetragrammaton, which Jews do not mention aloud. *Id.* at 6-7; Adland Aff. ¶ 8.

Some of the prayers offered from the Speaker's podium in the House of Representatives avoided endorsing particular sects or beliefs. They included a broad spectrum of faith and belief and avoided sending the message to many that they are "outsiders" and to others that they are "insiders."[3] The substantial majority, however, were different. After reviewing all available transcripts of prayers from the House sessions in 2005, the court finds that, the actual practice amounts on the whole to a clear endorsement of Christianity, sending the message to others that they are outsiders and the message to Christians that they are favored insiders. No other specific religious faith was endorsed or invoked. The only available transcript of a prayer led by anyone not professing the Christian faith, by a Muslim imam on March 8th, was inclusive and was not identifiable as distinctly Muslim from its content.

No cleric or Representative has ever been admonished, corrected, or advised in any way about the religious content of the prayer that he or she delivered. Jt. Stip. Facts (First) ¶ 22. As of the time of trial, Speaker Bosma was aware of the

---

[3]The prayers of March 15th, March 17th, and April 28th, for example, fall squarely within the tradition of non-sectarian legislative prayers permitted by *Marsh v. Chambers*. See Jt. Ex. 23.

controversy and objections to the sectarian content of most of the prayers offered in 2005. He planned to continue the practice of invocations being delivered at the start of each meeting day, and he did not expect to make any changes concerning how invocations are given, who gives the invocations, or the character of House oversight of the invocations' content. *Id.* ¶ 27.

The parties have submitted testimony from several scholars and clerics of different faiths. Some assert that many of the legislative prayers delivered during the 2005 House session were sectarian, Christian in orientation, and sent a strong message of non-inclusion to those who are not Christian. See Adland Aff.; Williamson Aff. There is no contrary testimony on those points. Others, all Christian clergy, assert that if they are told to omit a reference to Jesus Christ from a public prayer, they will not be able to offer such a prayer as a matter of conscience. See Rosenau Aff.; Raderstorf Aff.; Bebawi Aff. The court credits those undisputed statements, as well.

II.    *The Plaintiffs*

Four plaintiffs have brought suit against Speaker Bosma challenging the Christian orientation of most of the prayers delivered during the 2005 House session. Plaintiffs do not seek to have the prayers eliminated altogether. A court order barring all prayers would run contrary to *Marsh v. Chambers.*

All plaintiffs are Indiana taxpayers who object to their taxes being used to support the current legislative prayers. See Hinrichs Dep. at 53; Gerner Dep. at 51-52; Quigley Dep. at 33-35; Herold Dep. at 45-46; see also Cplt. ¶¶ 38, 43, 46, 51. All plaintiffs acknowledge that the cost of the prayers would not decrease if the objectionable language were removed but the general practice of legislative prayer continued. See Hinrichs Dep. at 42-44; Gerner Dep. at 51-52; Quigley Dep. at 54; Herold Dep. at 46; see also Jt. Stip. Facts (First) ¶ 31.

Plaintiff Anthony Hinrichs is a member of the Society of Friends and an Indiana taxpayer. Hinrichs Dep. at 5-7, 42; Hinrichs Interrog. Nos. 3-5. Hinrichs worked as a lobbyist for the Indiana Friends Committee on Legislation ("IFCL") during the 2005 legislative session. Hinrichs Dep. at 5-6. In carrying out his work, he saw or listened to many of the prayers, and he objects to the sectarian content of many of them. Hinrichs Dep. at 9-21, 51-52; Hinrichs Interrog. No. 9. On November 8, 2005, following the trial in this case, IFCL informed Hinrichs that he could no longer work as its lobbyist and that it had hired a replacement for him. Hinrichs Supp. Dec. ¶ 1. IFCL discharged Hinrichs because of this litigation and the position he took concerning legislative prayer. *Id.* ¶ 2. He is therefore not currently a lobbyist, and he has no plans to lobby in the Indiana General Assembly on behalf of IFCL or any other entity in the future. *Id.* ¶ 3.[4]

---

[4]Because a plaintiff's standing affects the court's subject matter jurisdiction, which must exist at every stage of the case, the court has allowed Hinrichs to supplement the record without objection from the Speaker. See Docket No. 29. If Hinrichs intended to continue lobbying in the future – whether professionally
(continued...)

Plaintiff Reverend Henry Gerner is an Indiana taxpayer and a retired minister of the United Methodist Church.  Gerner Dep. at 12, 14-15, 52; Gerner Interrog. Nos. 3-5.  He visited the General Assembly once several years ago. Gerner Dep. at 8-9.  Reverend Gerner has not seen the House prayers live or via the Internet, but he did review a transcript of the content of some of the delivered prayers before this lawsuit was filed.  *Id.* at 13-14, 53.

Plaintiff Francis White Quigley is an Indiana taxpayer and belongs to the Roman Catholic church.  Quigley Dep. at 14, 35; Quigley Interrog. Nos. 3-5.  He has never been in the House while the prayer was being delivered.  Quigley Dep. at 42.  He has, however, listened to a number of prayers through the Indiana General Assembly website.  Quigley Dep. at 44; Quigley Interrog. No. 9.

Plaintiff Lynette Herold is also a Roman Catholic and an Indiana taxpayer. Herold Dep. at 14; Herold Interrog. Nos. 3-5.  She has never visited the General Assembly, but did view about three of the prayers via the Internet.  Herold Dep. at 9-10; Herold Interrog. No. 9.  She has written some editorial letters to a

---

[4](...continued)
or simply as a citizen exercising his right to petition his elected representatives – he would have standing based on his direct contact with the legislative prayers. See *Books v. City of Elkhart*, 235 F.3d 292, 301 (7th Cir. 2000) (plaintiff had standing to challenge religious display in municipal building because he had right and/or duty to attend the government building where display was located); *see also Books v. Elkhart County*, 401 F.3d 857, 862 (7th Cir. 2005) (same, for county administration building); *Doe v. County of Montgomery*, 41 F.3d 1156, 1159 (7th Cir. 1994) (same, for county courthouse).  After Hinrichs was fired, however, plaintiffs withdrew their claim of standing based on Hinrichs' work and limited their standing argument to taxpayer standing, discussed below.

newspaper to complain about the prayers delivered during the 2005 legislative session.  Herold Dep. at 6.

*Conclusions of Law*

I.     *Plaintiffs' Standing*

Speaker Bosma argues that plaintiffs lack standing to bring this case.  A plaintiff must have standing to invoke the limited power of the federal courts to decide "cases and controversies" under Article III of the United States Constitution, which establishes the judicial power of the United States.  "[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' and that the injury 'fairly can be traced to the challenged action' and 'is likely to be redressed by a favorable decision.'"  *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982) (internal citations omitted); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Books v. Elkhart County*, 401 F.3d 857, 861 (7th Cir. 2005).

In this case, each of the plaintiffs is an Indiana taxpayer.  Indiana tax funds are spent on the House practice of prayer by mailing confirmation and thank-you letters to clerics, by printing and mailing photographs to clerics, and by offering streaming video of the prayers over the Internet.   Such expenditures are

measurable disbursements of government funds, occasioned solely because of the prayer practice. These expenditures are sufficient to support standing for the plaintiff-taxpayers who object to the practice supported by the expenditures.

In *Marsh v. Chambers* itself, the Supreme Court signaled that the plaintiff had standing as a state taxpayer, along with his role as a legislator: "we agree that Chambers, as a member of the Legislature and as a taxpayer whose taxes are used to fund the chaplaincy, has standing to assert this claim." 463 U.S. 783, 786 n.4 (1983). Although Chambers also had standing as a legislator, there was no reason for the Court to mention his status as a taxpayer if it were not relevant to his standing. As then Circuit Judge Ruth Bader Ginsburg wrote about footnote 4 in *Marsh*: "The High Court acknowledged state taxpayer standing to raise the question, and found no other justiciability barrier." *Murray v. Buchanan*, 720 F.2d 689, 699 (D.C. Cir. 1983) (en banc) (opinion of Ginsburg, J.). This court sees no principled distinction between taxpayer standing in *Marsh* and in this case. Accord, *Van Zandt v. Thompson*, 839 F.2d 1215, 1217 (7th Cir. 1988) (following *Marsh*, taxpayer had standing to challenge a prayer room in the state capitol "since he is an Illinois taxpayer and since the proposed prayer room would arguably place economic burdens of various sorts on the State of Illinois and its taxpayers").

*Marsh*'s recognition of taxpayer standing is consistent with a long line of Establishment Clause cases recognizing that state and local taxpayers have

standing to challenge government practices that allegedly violate the Establishment Clause where they can identify specific government expenditures resulting from the challenged practice. In *Doremus v. Board of Education*, the Court denied standing to New Jersey taxpayers challenging a state statute that provided for daily reading of the Old Testament in public schools. 342 U.S. 429 (1952). The taxpayers would have had standing, however, if they had brought a "good-faith pocketbook action" by showing a "measurable appropriation or disbursement of school-district funds occasioned solely by the activities complained of," *id.* at 434, as the taxpayers had shown in *Everson v. Board of Education*, 330 U.S. 1, 3-4 (1947) (recognizing taxpayer standing in challenge to public subsidy for transportation of children to parochial schools). The problem in *Doremus* was that the plaintiff-taxpayers had simply failed to identify any public expenditures on the challenged practice. 342 U.S. at 433.[5]

A state taxpayer can satisfy the standing requirement in an Establishment Clause case by showing that tax funds are expended on the challenged practice. *Freedom From Religion Foundation, Inc. v. Bugher*, 249 F.3d 606, 610 (7th Cir.

---

[5]Federal taxpayers are generally not permitted to bring suit challenging federal government expenditures, see *Frothingham v. Mellon*, 262 U.S. 447, 486-89 (1923), but the Supreme Court has recognized an exception for challenges to expenditures allegedly in violation of the Establishment Clause since *Flast v. Cohen*, 392 U.S. 83 (1968). *Flast* held that a federal taxpayer could challenge the constitutionality of a federal spending program by satisfying two requirements. The federal taxpayer must show that the disbursement violates the Establishment Clause and that it was made pursuant to Congress' power to tax and spend. 392 U.S. at 102-03.

2001) (affirming finding that state taxpayers had standing to challenge state grants to religious schools);  accord, *Minnesota Federation of Teachers v. Randall*, 891 F.2d 1354, 1358 (8th Cir. 1989) (reversing finding that taxpayer lacked standing:  "state taxpayers need only show that there has been a disbursement of tax money in potential violation of constitutional guarantees").  In *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002), the Supreme Court ruled on the merits of state taxpayers' Establishment Clause challenge to a school voucher program.  The state taxpayers' standing was so obvious that the Court did not even mention the issue of standing, which was of course essential to the Court's subject matter jurisdiction.

The amounts spent on the practice in this case are obviously very modest.  They amounted to no more than several hundred dollars over the course of the 2005 session.[6]  In light of the modest expenditures, it should be noted that a taxpayer is not required to demonstrate either that the government practice measurably increases her taxes or that a court victory would cut her tax bill.  See, *e.g.*, *Cammack v. Waihee*, 932 F.2d 765, 769 (9th Cir. 1991) (recognizing that a state or municipal taxpayer need not prove that "her tax burden will be lightened by elimination of the questioned expenditure");  *Minnesota Federation of Teachers v. Randall*, 891 F.2d at 1358 (recognizing standing for taxpayer challenge

---

[6]Assuming a total of 53 prayers, with a confirmation letter, photograph, and thank-you letter for each, plus an average duration of three minutes per prayer for the webcast, the total direct costs for the session's prayers would have been $448.38.

to state statute reallocating some public high school funds to religiously affiliated colleges: "we do not believe that state taxpayers are required to show an increase in their tax burdens to allege sufficient injury"); see also *District of Columbia Common Cause v. District of Columbia*, 858 F.2d 1, 5 (D.C. Cir. 1988) ("The Supreme Court has never required state or municipal taxpayers to demonstrate that their taxes will be reduced as a result of a favorable judgment"; "[i]f a state taxpayer has shown that the challenged program involves a measurable appropriation of public funds, the Court will recognize standing").

As long as a taxpayer can show specific public expenditures on the challenged practice, it does not matter that the taxpayer's primary motive for bringing the suit is to eliminate the religious content of the practice.   See *Doremus*, 342 U.S. at 434-35 ("If appellants established the requisite special injury necessary to a taxpayer's case or controversy, it would not matter that their dominant inducement to action was more religious than mercenary.").   Plaintiffs have met this standard here.   They are not relying on general government expenditures but have identified specific expenses that the government incurs as a result of the practice of legislative prayer.[7]

---

[7]Outside the Establishment Clause context, in which taxpayer standing has frequently been recognized, four members of the Supreme Court stated in dicta in *ASARCO, Inc. v. Kadish*, 490 U.S. 605, 614 (1989) (Kennedy, J.), that state taxpayers would not have had standing in federal court to challenge state mineral leases because the possibility of "direct pecuniary relief from this lawsuit is 'remote, fluctuating and uncertain,'" so that their claimed injury was not likely to be redressed by a favorable decision.   In taxpayer challenges to government expenditures under the Establishment Clause, however, neither the Supreme
(continued...)

The Speaker argues that plaintiffs must go further and must demonstrate that a favorable ruling will actually reduce the money spent by the government. That is, the Speaker contends that there can be no taxpayer standing unless plaintiffs can identify a "marginal cost" resulting from the allegedly unconstitutional content of the prayers. Under this theory, plaintiffs would have to show that relief would necessarily result in less spending rather than only allowing the same sums to be spent on a practice that complies with the Constitution. The plaintiffs in this case acknowledge that *Marsh v. Chambers* permits some type of legislative prayer. They have limited their challenge to only the sectarian content of the prayers. They also acknowledge that the sectarian content does not add any costs to the prayers that would not otherwise be incurred.

The Speaker's argument misunderstands the injury alleged by taxpayers bringing Establishment Clause cases. The plaintiffs' injury is not simply their payment of taxes. Rather, it is the misuse of their tax payments for purposes they contend are unconstitutional. See *Doe v. Madison School District*, 177 F.3d 789, 797 (9th Cir. 1999) ("Taxpayer standing protects against only one type of injury, namely, the 'misuse of public funds.'"), quoting *Fuller v. Volk*, 351 F.2d 323, 327 (3d Cir. 1965); see also *District of Columbia Common Cause*, 858 F.2d at 5 (holding, outside Establishment Clause context, that municipal taxpayers had

---

[7](...continued)
Court nor lower courts have imposed such a stringent standard because the alleged harm is the misuse of tax dollars, not the fact that they are spent at all.

standing to challenge District of Columbia's use of public funds to oppose citizen initiatives and noting that *Frothingham* characterized taxpayer's injury as the "misuse" of municipal funds, not the payment of taxes). The injury can be redressed if a court enjoins an unlawful practice, either eliminating it altogether or ensuring that the same funds go toward a lawful substitute practice. As Judge Buckley wrote for the District of Columbia Circuit:

> The Supreme Court has never required state or municipal taxpayers to demonstrate that their taxes will be reduced as a result of a favorable judgment. If a state taxpayer has shown that the challenged program involves a measurable appropriation of public funds, the Court will recognize standing. The injury – misuse of public funds – is redressed by an order prohibiting the expenditure. See, *e.g.*, *Grand Rapids School District v. Ball*, 473 U.S. 373, 380 n. 5 (1985), and cases cited; *Chambers v. Marsh*, 675 F.2d 228, 230 (8th Cir. 1982) (taxpayer has standing to challenge payment of $320 per month out of general tax revenues to legislative chaplain), *aff'd in relevant part*, 463 U.S. 783, 786 n. 4 (1983).

*District of Columbia Common Cause*, 858 F.2d at 5.[8]

The cases cited by the Speaker do not introduce a marginal cost requirement for taxpayer standing where the taxpayers have already identified public expenditures on the challenged practice, as plaintiffs have here. In *Doremus* itself, standing was lacking because the plaintiffs failed to show on the record that *any* costs could be traced to the challenged practice. See 342 U.S. at

---

[8]The Supreme Court has overruled *Grand Rapids School District v. Ball* on the merits of the Establishment Clause issue, see *Agostini v. Felton*, 521 U.S. 203 (1997) (allowing public school teachers to provide remedial education in parochial schools to disadvantaged children), but the finding of taxpayer standing remains good law.

431, 433.  The Court in *Doremus* carefully distinguished *Everson v. Board of Education*, 330 U.S. 1 (1947), in which it found that taxpayers had standing to challenge a local government's practice of providing transportation to both public and parochial schools.   "*Everson* showed a measurable appropriation or disbursement of school-district funds occasioned solely by the activities complained of.  This complaint does not."  342 U.S. at 434.  Plaintiffs in this case have taken to heart the lesson of *Doremus* and have offered uncontested evidence of specific and measurable disbursements of public funds for the challenged activity.

In *Gonzales v. North Township of Lake County*, the Seventh Circuit held that taxpayers did not have standing to challenge a crucifix erected in a public park.  4 F.3d 1412 (7th Cir. 1993).  The crucifix had been donated to the county, and no government money was used for its upkeep.  *Id.* at 1416.  The court stated that taxpayer standing could not rest on funds spent to maintain the areas around the crucifix because "this cost would be incurred with or without the presence of the crucifix."  *Id.*  This last observation was simply another way of noting that the plaintiffs could not show that any government money was spent on the challenged practice.   That is, the same lawn-care expenditures would have been made whether there was a religious monument, a secular monument, or no monument at all.  The plaintiffs in *Gonzales* did not lack standing because they could not demonstrate a marginal cost.  They lacked standing because, like the plaintiffs in *Doremus*, they could not demonstrate that *any* public funds were spent on the

disputed practice.  *Gonzales* would be relevant if the plaintiffs in this case were relying on expenditures to light, heat, and maintain the Statehouse, for example, but they are not.  These plaintiffs have identified expenditures, modest though they are, directly attributable to the practice of offering prayers to begin House sessions.

In *Freedom From Religion Foundation, Inc. v. Zielke*, 845 F.2d 1463, 1470 (7th Cir. 1988), the Seventh Circuit also rejected taxpayer standing, not for lack of evidence of marginal cost, but because the plaintiff conceded that no tax funds were used to display the Ten Commandments monument in the park.  The plaintiff had also failed to allege or prove that she was actually a municipal taxpayer.  *Id.*[9]

Two hypothetical examples demonstrate the problem with the Speaker's proposed marginal cost requirement for taxpayer standing in Establishment Clause cases.  As plaintiffs point out, a state could pass a law providing for the

---

[9]The same distinction applies to two cases finding that taxpayers lacked standing to challenge prayers at public high school graduations.  In *Friedmann v. Sheldon Community School District*, 995 F.2d 802, 803 (8th Cir. 1993), the plaintiffs were unable to show that any tax funds went toward the invocation.  At most, they had shown only that state money was spent on diplomas given during the ceremony.  More recently, in *Doe v. Madison School District*, 177 F.3d 789, 794 (9th Cir. 1999), the Ninth Circuit rejected a similar taxpayer challenge to a graduation prayer because the plaintiff could demonstrate only that the school had spent money to rent the hall, print programs, buy decorations, and hire security guards for the graduation ceremony.  She identified "no tax dollars that defendants spent solely on the graduation prayer, which is the only activity that she challenges."  *Id.*

erection of a cross at taxpayer expense or, if successfully challenged in court, a secular monument at the same cost. See Pl. Br. at 15 n.5. If there were a marginal cost requirement, taxpayers would not be able to sue. Yet the direct expenditure of public funds on a religious display would obviously violate the Establishment Clause and would injure the taxpayers by depriving them of their right to be free from having their tax dollars, exacted from them under penalty of law, spent to endorse a particular religion. Or, a public school district could purchase science textbooks teaching only the Genesis account of creation, and could defend a taxpayer's challenge to the constitutionality of the purchase by arguing that science textbooks would have been bought at the same expense with or without religious content.

In short, under the Speaker's theory of standing, a taxpayer would never be able to challenge, on the basis of taxpayer standing, a government practice that endorsed a religion if it could also be conducted – at the same cost – without violating the Establishment Clause. Contrary to the Speaker's view of taxpayer standing, courts have not required taxpayers to show that their taxes would decrease if the challenged practice were enjoined. See *District of Columbia Common Cause*, 858 F.2d at 5 ("The taxpayer's injury is not the *payment* of taxes, for which the only cure would be a rebate or reduction in taxes.") (emphasis in original).

In this case the House's prayer practice is indeed paid for by taxpayer funds, through confirmation and thank-you letters and photographs sent to clergy, and additional web-streaming time.  Though these costs are not directly attributable to the content of the invocations, they are directly attributable to the practice of legislative prayer that plaintiffs challenge.  Because the plaintiffs are Indiana taxpayers who have proven "a measurable appropriation or disbursement of [public] funds occasioned solely by the activities complained of," *Doremus*, 342 U.S. at 434, all four plaintiffs have standing under Article III to challenge the constitutionality of the official legislative prayers.

II.     *The Establishment Clause Claim*

A.     *Prayers as Government Speech*

Turning to the merits of the Establishment Clause issue, the parties agree that the prayers offered from the podium of the House of Representatives are government speech.  See Pl. Br. at 20-22; Hearing Tr. at 23-24.  The Speaker controls access to the podium.  The prayers may not be offered without the Speaker's permission. The Speaker also has not tried to create any sort of public forum that would be available to private speakers to exercise their own First Amendment rights of free speech and free exercise of religion.  In fact, the Speaker

has expressly denied any intention to establish any sort of public forum.  Hearing Tr. at 23-24.[10]

Under the First Amendment, the fact that the prayers are government speech is pivotal.  There is "a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Santa Fe Independent School District v. Doe*, 530 U.S. 290, 302 (2000), quoting *Board of Education v. Mergens*, 496 U.S. 226, 250 (1990) (opinion of O'Connor, J.) (emphasis in original).

The "touchstone" of the Establishment Clause is the principle that the "First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion." *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968); *Everson v. Board of Education*, 330 U.S. 1, 15-16 (1947).  Manifesting a purpose to favor one faith over another, or adherence to religion generally, clashes with the "understanding, reached . . . after decades of religious war, that liberty

_____

[10]That denial is perfectly understandable.  Establishing a true public forum of any variety addressing religious belief would open the podium to a very wide range of viewpoints.  Such a forum could be difficult to manage, and the task could easily interfere with and distract from the legislature's principal purpose of governing the state.  Government bodies that find they have created a public forum often respond to controversies over access by closing the forum entirely. See, *e.g.*, *Grossbaum v. Indianapolis-Marion County Bldg. Auth.*, 100 F.3d 1287, 1290 (7th Cir. 1996) (affirming denial of relief from policy closing government building to private displays of any kind after controversy led to litigation over religious holiday displays).

and social stability demand a religious tolerance that respects the religious views of all citizens . . . ." *Zelman v. Simmons-Harris*, 536 U.S. 639, 718 (2002) (Breyer, J., dissenting).   When the government favors a particular religion, it "sends the . . . message to . . . nonadherents 'that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members . . . .'" *McCreary County v. American Civil Liberties Union of Kentucky*, 125 S. Ct. 2722, 2733 (2005), quoting *Santa Fe Independent School Dist.*, 530 U.S. at 309-10, quoting in turn *Lynch v. Donnelly*, 465 U.S. 668, 688 (1984) (O'Connor, J., concurring).

B.      *Marsh v. Chambers and the Special Status of Legislative Prayer*

In *Marsh v. Chambers*, the Supreme Court recognized a special exception to the usual Establishment Clause doctrines and permitted the practice of having a paid legislative chaplain offer invocations in a state legislature.  463 U.S. 783 (1983).  *Marsh v. Chambers* establishes the principles and boundaries that guide this court's consideration of the Indiana House prayer practices.  Accord, *e.g., Simpson v. Chesterfield County*, 404 F.3d 276, 280-82 (4th Cir. 2005) ("*Marsh*, in short, has made legislative prayer a field of Establishment Clause jurisprudence with its own set of boundaries and guidelines.").[11]

---

[11]The practice of any form of legislative prayer would probably not survive scrutiny under the most common Establishment Clause tests, the *Lemon* test drawn from *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971), the endorsement test articulated by Justice O'Connor, see *Lynch v. Donnelly*, 465 U.S. at 690 (O'Connor, J., concurring), or the neutrality test, *Rosenberger v. University of* (continued...)

In *Marsh*, the Nebraska legislature had hired a chaplain who opened each daily legislative session with a prayer.  For sixteen years, the chaplain had been a Presbyterian minister who was paid a modest stipend for his services.  463 U.S. at 784-85, 793.  For many years, the chaplain's prayers had included explicitly Christian content.  See *id.* at 823 n.2 (Stevens, J., dissenting) (quoting a 1978 prayer that included a detailed account of the crucifixion and resurrection of Jesus).  In 1980, however, after a non-Christian legislator complained, and apparently while the lawsuit was pending, the chaplain "removed all references to Christ." *Id.* at 793 n.14 (majority opinion).

The Supreme Court held that the Nebraska legislature's practice did not violate the Establishment Clause.  Writing for the Court, Chief Justice Burger reviewed the long and sometimes controversial history of legislative prayer in America since colonial times.  463 U.S. at 786-92.  The Court's opinion gave special emphasis to the practices of legislators at the Nation's founding, in the Continental Congress and in the First Congress.  For example, the First Congress approved the Bill of Rights, including the Establishment Clause of the First

---

[11](...continued)

*Virginia*, 515 U.S. 819, 839 (1995).  The practice might survive the coercion test, see *Lee v. Weisman*, 505 U.S. 577, 640 (1992) (Scalia, J., dissenting), though judges must keep in mind that it may be easy for members of a religious majority to overlook coercive effects of official practices that favor their own religious traditions.  See, *e.g.*, *Engel v. Vitale*, 370 U.S. 421, 431 (1962) ("When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain.").

Amendment, just three days after the same Congress had authorized appointment of paid chaplains for the House and Senate. *Id.* at 788. "Clearly the men who wrote the First Amendment Religion Clause did not view paid legislative chaplains and opening prayers as a violation of that Amendment, for the practice of opening sessions with prayer has continued without interruption ever since that early session of Congress." *Id.* The Court concluded:

> In light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society. To invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an "establishment" of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country.

*Id.* at 792.

The Court then considered three specific objections to the Nebraska legislature's practice. First, the Court found that the one Presbyterian minister's long tenure as chaplain did not present an Establishment Clause problem, at least in the absence of proof of impermissible motive. 463 U.S. at 793-94. Second, the Court found that paying the chaplain did not violate the Establishment Clause in light of the historical evidence showing stipends paid to legislative chaplains since the founding of the Nation. *Id.* at 794.

The Court's response to the third point is most relevant here.  The plaintiff objected that the prayers were "in the Judeo-Christian tradition."  *Id.* at 793.  From this statement, the Court dropped footnote 14:

> [Chaplain] Palmer characterizes his prayers as "nonsectarian," "Judeo Christian," and with "elements of the American civil religion."  App. 75 and 87.  (Deposition of Robert E. Palmer).  Although some of his earlier prayers were often explicitly Christian, Palmer removed all references to Christ after a 1980 complaint from a Jewish legislator.  *Id.*, at 49.

*Id.* at 793 n.14.  The Court's response to this third point appears after its discussion of the payment issue.  The Court wrote:

> The content of the prayer is not of concern to judges where, as here, *there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief.*  That being so, it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer.

*Id.* at 794-95 (emphasis added).

From the Court's opinion in *Marsh v. Chambers*, this court draws the following guidance.  First, the fact that prayers are offered to open legislative sessions does not, without more, violate the Establishment Clause.  Second, the fact that prayers are offered "in the Judeo-Christian tradition" also does not violate the Establishment Clause, at least where the prayers are not explicitly Christian or explicitly Jewish.  Third, however, there are constitutional limits to legislative prayer.  The clear implication is that where "the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith

or belief," official legislative prayers would violate the Establishment Clause.

Accord, *Chesterfield County*, 404 F.3d at 283.

These limits are consistent with the Supreme Court's own account of

*Marsh v. Chambers*, offered as part of its decision in *County of Allegheny v.*

*American Civil Liberties Union*, 492 U.S. 573 (1989).  The Court held in *Allegheny*

that a holiday season display of a creche in the county courthouse violated the

Establishment Clause.   Writing for the Court majority, Justice Blackmun

responded to Justice Kennedy's reliance on *Marsh* in dissent:

> Indeed, in *Marsh* itself, the Court recognized that not even the "unique history" of legislative prayer, 463 U.S., at 791, can justify contemporary legislative prayers that have the effect of affiliating the government with any one specific faith or belief.  *Id.*, at 794-795.  *The legislative prayers involved in Marsh did not violate this principle because the particular chaplain had "removed all references to Christ." Id.*, at 793, n.14.  Thus, *Marsh* plainly does not stand for the sweeping proposition * * * that all accepted practices 200 years old and their equivalents are constitutional today. * * * The history of this Nation, it is perhaps sad to say, contains numerous examples of official acts that endorsed Christianity specifically.  Some of these examples date back to the Founding of the Republic, but this heritage of official discrimination against non-Christians has no place in the jurisprudence of the Establishment Clause.   Whatever else the Establishment Clause may mean (and we have held it to mean no official preference even for religion over nonreligion), it certainly means at the very least that *government may not demonstrate a preference for one particular sect or creed (including a preference for Christianity over other religions)*.  The clearest command of the Establishment Clause is that *one religious denomination cannot be officially preferred over another*.  There have been breaches of this command throughout this Nation's history, but they cannot diminish in any way the force of the command.

492 U.S. at 603-05 (emphases added) (internal quotation marks and citations

omitted); accord, *id.* at 630-31 (O'Connor, J., concurring) (explaining that

legislative prayer in *Marsh* did not violate Establishment Clause because both the long history and the "nonsectarian" character of the practice avoided conveying "a message of endorsement of particular religious beliefs").[12]

C.     *Cases Interpreting the Limits of Marsh v. Chambers*

Since *Marsh v. Chambers* was decided in 1983, lower courts have had to determine whether particular practices of governmental prayer have provided opportunities that were "exploited to proselytize or advance any one, or to disparage any other, faith or belief." The decisions of these courts demonstrate that the consistently sectarian legislative prayers in the Indiana House of Representatives go far beyond what *Marsh* permits. The prayer opportunities have frequently and consistently been used to advance the Christian religion.

Two recent decisions from the Fourth Circuit provide thoughtful guidance in marking *Marsh*'s boundaries. The first found that regular Christian prayers to open a legislative body violated the Establishment Clause. The second found that a very different practice of deliberately non-sectarian prayer was consistent with the Establishment Clause.

------

[12]As the Fourth Circuit has noted, the discussion of *Marsh* in *Allegheny County* may be dicta, strictly speaking, but the discussion was carefully considered and is entirely consistent with *Marsh* itself. Lower courts must give such considered lessons significant weight. *Wynne v. Town of Great Falls*, 376 F.3d 292, 298 n.3 (4th Cir. 2004).

In *Wynne v. Town of Great Falls*, 376 F.3d 292, 294 (4th Cir. 2004), a town council had adopted a practice of opening its meetings with a Christian prayer, concluding, for example, "In Christ's name we pray." Town citizens who attended the meetings would customarily stand, bow their heads, and say "amen" in unison at the end of the prayers. Wynne, a regular visitor at the meetings, was a follower of the Wiccan religion and eventually objected to the explicitly Christian character of the prayers. *Id.* at 294-95. She proposed that prayers be limited to prayers to "God" or that members of different religions be invited to offer prayers. *Id.* at 295. There was a quick and organized response to block that proposal, and the future plaintiff became the target of hostility and suggestions that she should leave town. *Id.* at 295-96. Wynne's attempts to arrive late at meetings to avoid the prayers prevented her from signing up for opportunities to speak at the meeting, which were otherwise available to citizens. *Id.*

Wynne eventually filed suit. The district court held that the town council's prayer practice violated the Establishment Clause as interpreted in *Marsh*. The Fourth Circuit affirmed. The prayers in *Marsh* had been permissible because they were not exploited to affiliate the government with one specific faith in preference to others. 376 F.3d at 298. The prayers in *Marsh* were non-sectarian and civil, and references to Christ had been removed. The Great Falls prayers, however, "frequently" contained references to Christ, showed sectarian or denominational preferences, and "thus promoted one religion over all others, dividing the Town's

citizens along denominational lines." *Id.* at 298-99.  In terms of *Marsh*, the prayer opportunity had been exploited to "advance" one faith.

Although there is considerable debate in our society and in our courts over the precise scope of the Establishment Clause, the Fourth Circuit recognized that there is broad agreement that the government may not show preferences for particular denominations or sects.  *Id.* at 299, collecting sources, including *Lee v. Weisman*, 505 U.S. at 641 (Scalia, J., dissenting) ("our constitutional tradition . . . [has] ruled out of order government-sponsored endorsement of religion – even when no legal coercion is present, and indeed even when no ersatz, 'peer-pressure' psycho-coercion is present – where the endorsement is sectarian, in the sense of specifying details upon which men and women who believe in a benevolent, omnipotent Creator and Ruler of the world are known to differ (for example, the divinity of Christ)"); accord, *Larson v. Valente*, 456 U.S. 228, 244 (1982) (one command of the Establishment Clause is "clear[]," that "one religious denomination cannot be officially preferred over another").

The Fourth Circuit rejected the town's argument that the official prayers in the name of Jesus Christ were "in the Judeo-Christian tradition" as that term was used in *Marsh*.  See *Great Falls*, 376 F.3d at 299-300.  The permissible ground for official prayer under *Marsh* was the common ground shared by Judaism and Christianity and did not extend to the divinity or lack of divinity of Jesus of Nazareth.  See *id.*  The Fourth Circuit affirmed an injunction enjoining the town

council "from invoking the name of a specific deity associated with any one specific faith or belief in prayers given at Town Council meetings." *Id.* at 302.

In *Simpson v. Chesterfield County*, 404 F.3d 276 (4th Cir. 2005), the Fourth Circuit reached a different conclusion about a very different practice. The county legislature had established a practice of inviting local clergy to offer prayers to open their meetings. 404 F.3d at 278. The specific issue was whether a county resident who described herself as a spiritual leader in the Wiccan religion was entitled to be included in the list of clergy available to offer prayers. *Id.* at 279-80. Writing for the court, Judge Wilkinson carefully described the county's practices and found that they were consistent with *Marsh* and the *Great Falls* case and did not require the county to open up the prayer opportunity to all religions.

The county's policy was to include "a non-sectarian invocation." 404 F.3d at 278. The policy tracked the language of *Marsh* and stated that each "invocation must be non-sectarian with elements of the American civil religion and must not be used to proselytize or advance any one faith or belief or to disparage any other faith or belief." *Id.* The Fourth Circuit described the factual findings on the contents of the prayers:

> The magistrate judge noted that this principle [that prayers be non-sectarian] was generally satisfied: "As to the effect and/or impact of the invocations . . ., they are but brief, benign pronouncements of simple values that are not controversial nor confrontational but for, at most, mention of specific Judeo-Christian references that are nevertheless clearly recognized as symbols of the universal values intended to be conveyed." *Simpson v. Chesterfield County Bd. of Supervisors*, 292 F. Supp. 2d 805, 820 (E.D. Va.

> 2003).  The County, seeking to avoid the slightest hint of sectarianism,
> revised its invitation letter to the clergy.  The letter now directs clerics to
> avoid invoking the name of Jesus Christ, a custom to which Christian clergy
> often had adhered when closing their invocations in the past.

404 F.3d at 279.  The court noted that the direction to clerics to avoid invoking

the name of Jesus Christ had come during litigation, as had Chaplain Palmer's

similar change in practice during the *Marsh v. Chambers* litigation.  *Id.* at 279 n.1,

citing *Marsh*, 463 U.S. at 793 n.14.

The Fourth Circuit found that the county's policy kept its practices within

"the spacious boundaries set forth in *Marsh*":

> Chesterfield's policy, adopted in the immediate aftermath of *Marsh*, echoes
> rather than exceeds *Marsh*'s teachings.  The County never insisted on the
> invocation of Jesus Christ by name, as the Town Council in *Great Falls* did.
> *Id.* at 301.  In fact, Chesterfield has aspired to non-sectarianism and
> requested that invocations refrain from using Christ's name or, for that
> matter, any denominational appeal.  Reflecting the effort to include diverse
> creeds, Chesterfield has had a wide variety of prayers, the richness of which
> is quite revealing.  Clerics from multiple faiths and traditions have
> described divinity in wide and embracive terms – "Lord God, our creator,"
> "giver and sustainer of life," "the God of Abraham, Isaac and Jacob," "the
> God of Abraham, of Moses, Jesus, and Mohammad," "Heavenly Father,"
> "Lord our Governor," "mighty God," "Lord of Lords, King of Kings, creator of
> planet Earth and the universe and our own creator."  Chesterfield's
> openness to this ecumenism is consonant with our character both as a
> nation of faith and as a country of free religious exercise and broad religious
> tolerance.

404 F.3d at 284.  The court therefore concluded that the county's practice had not

crossed the constitutional line.  "Rather, the restraints made plain in the Board's

policy and respected by those who lead invocations ensure that the prayers do not

'proselytize or advance any one, or [ ] disparage any other, faith or belief,' *Marsh*, 463 U.S. at 794-95, and therefore are constitutionally sound."  404 F.3d at 284.

The Ninth Circuit read *Marsh v. Chambers* in a very similar way in *Bacus v. Palo Verde Unified School District*, a decision that (curiously) was not deemed appropriate for publication and citation within the Ninth Circuit but is available at 52 Fed. Appx. 355, 2002 WL 31724273 (9th Cir. 2002).  A school board began its meetings with an invocation, always "in the Name of Jesus," and no followers of non-Christian religions ever gave the invocation.  52 Fed. Appx. at 356-57.  The district court had denied a preliminary injunction, finding that the prayers did not advance or proselytize any one faith.  11 F. Supp. 2d 1192, 1197-98 (C.D. Cal. 1998).  The Ninth Circuit found that the prayers did not disparage other religious beliefs or proselytize for Christianity, but that they did, in the terms of *Marsh*, "advance" Christianity.  52 Fed. Appx. at 357.  Accordingly, the Ninth Circuit reversed the district court's denial of an injunction against the prayers:

> These prayers advanced one faith, Christianity, providing it with a special endorsed and privileged status in the school board.  Some religions accept Jesus Christ as the Messiah, some do not, and some people do not believe in any religious faith.  Solemnizing school board meetings "in the Name of Jesus" displays "the government's allegiance to a particular sect or creed." *County of Allegheny v. ACLU*, 492 U.S. 573, 603 (1989).
>
> The school board's practice of almost always praying "in the Name of Jesus" to commence its meetings necessarily has the effect of "making adherence to a religion relevant" to the plaintiffs' "standing in the political community."  They sought to participate in and influence this political community, but they do not share the Christian religious beliefs with the school board member who generally performed the invocation and cannot honestly proceed "in the name of Jesus."

52 Fed. Appx. at 357.  The *Palo Verde* opinion reached the crux of the issue and explained its reasoning clearly and concisely.  It reversed a published decision by the district court.  The *Palo Verde* application of *Marsh* is persuasive as applied to legislative prayers that consistently and frequently invoke and advance the Christian religion.

The California Court of Appeals reached a similar result for similar reasons in *Rubin v. City of Burbank*, 124 Cal. Rptr. 2d 867 (Cal. App. 2002).  The city council began each meeting with a prayer, usually by a volunteering member of a non-denominational organization of clergy and representatives of other religious organizations.  *Id.* at 868-69.  Some prayers were expressly Christian in nature. See *id.* at 869 n.1.  About 20 percent of the volunteer clergy mentioned Jesus Christ.  *Id.* at 873.  Plaintiffs who attended the meetings challenged the sectarian nature of the prayers, and the trial court permanently enjoined the city from "knowingly and intentionally allowing sectarian prayer at City Council meetings." *Id.* at 869.

The appellate court affirmed, finding that the prayer practice advanced the Christian religion and thus fell outside the protection of *Marsh v. Chambers*.  The Christian prayers were sectarian prayers that advanced the Christian religion:

> As we have discussed, in light of the specific references to the Christian faith in the invocation, as distinguished from the invocation in *Marsh* from which any such reference had been excluded by design, the trial court properly considered whether the prayer opportunity had been exploited for the purpose of proselytizing, advancing or disparaging any one

belief or faith.  In deciding that it had, the court found the reference to Jesus Christ rendered the prayer "sectarian."

"Sectarian" is defined as relating to or characteristic of a sect.  A "sect" is defined as an organized ecclesiastical body, or a religious denomination.  The trial court's characterization of the invocation as "sectarian" was merely a definitional determination that the invocation unconstitutionally communicated a preference for one religious faith (or sect) over another.  Returning again to the *Marsh* test, in concluding that the prayer was sectarian, the trial court determined that the prayer opportunity had been exploited to advance one faith, Christianity, over another.

124 Cal. Rptr. 2d at 874 (footnotes omitted).[13]

---

[13]The Tenth Circuit applied *Marsh* in an unusual setting in *Snyder v. Murray City Corp.*, 159 F.3d 1227 (10th Cir. 1998) (en banc).  Mr. Snyder opposed several city councils' practices of opening meetings with prayers, and he asked for permission to give a prayer himself.  His proposed prayer called on a divine power to give government leaders the courage and wisdom to stop the practice of public prayer in government settings.  *Id.* at 1228 n.3.  Salt Lake City decided to stop its prayer practice, but Murray City persisted and also denied Snyder an opportunity to offer his prayer.  *Id.* at 1229-30.

The Tenth Circuit found that the city council's prayers fell within the boundaries permitted by *Marsh* and therefore rejected Snyder's demand to be included:

The genre approved in *Marsh* is a kind of ecumenical activity that seeks to bind peoples of varying faiths together in a common purpose.  That genre, although often taking the form of invocations that reflect a Judeo-Christian ethic, typically involves nonsectarian requests for wisdom and solemnity, as well as calls for divine blessing on the work of the legislative body.  When a legislative body prevents its agents from reciting a prayer that falls outside this genre, the legislators are merely enforcing the principle in *Marsh* that a legislative prayer is constitutional if it is "simply a tolerable acknowledgment of beliefs widely held among the people of this country." See *Marsh*, 463 U.S. at 792.

159 F.3d at 1234.  The court found that Snyder's proposed prayer both disparaged other beliefs and proselytized his own beliefs, so that the city council could exclude Snyder and his prayer as outside the *Marsh* boundaries.  *Id.* at 1235.  *Snyder* resembles this case insofar as the city council invited clergy from

(continued...)

The *Great Falls*, *Chesterfield County*, *Palo Verde*, and *Burbank* cases are generally consistent in their interpretation of *Marsh v. Chambers*. They demonstrate that *Marsh* protects the custom of non-sectarian legislative prayer, even by a paid chaplain. But when government prayers are expressly and consistently sectarian, *i.e.*, when they express the faith of a particular religion, then the opportunity for prayer is being used to advance a particular religion, contrary to the mandate of the Establishment Clause. The record in this case shows such expressly and consistently sectarian prayers used to advance a particular religion, in violation of the Establishment Clause.

D.    *The Speaker's Arguments*

1.    *History of Sectarian Prayer*

To oppose this conclusion, the Speaker and the *amici* clergy have presented several arguments. First, they point to historical and contemporary records of legislative prayer practices, going back to the Continental Congress and running forward to the present day in the United States Congress and state legislatures. Legislative prayers have often been expressly Christian, both recently and before the emergence of modern Establishment Clause jurisprudence. See, *e.g.*, *Newdow v. Bush*, 355 F. Supp. 2d 265, 285 n.23 (D.D.C. 2005) (denying

---

[13](...continued)

a variety of traditions to offer prayers. However, the decision provides little direct guidance because the court opinions give little indication of the content of those prayers.

preliminary injunction against prayer at presidential inauguration), citing Steven B. Epstein, *Rethinking the Constitutionality of Ceremonial Deism*, 96 Colum. L. Rev. 2083, 2106 (1996) ("within the last six years alone, over two hundred and fifty opening prayers delivered by congressional chaplains have included supplications to Jesus Christ").

In *Newdow v. Bush*, the court noted that presidential inaugurations had often featured sectarian prayers with references to "Jesus Christ our Lord" and to the Christian Trinity.   355 F. Supp. 2d at 287.   The court observed that Establishment Clause doctrine is "complex and unresolved," that the plaintiff might be able to show that the planned prayers fell outside of *Marsh*, but that he had not shown a sufficient likelihood of success to justify sweeping injunctive relief against any prayer at all at the inauguration.  *Id.* at 289-90.

The Speaker also cites *Murray v. Buchanan*, 720 F.2d 689 (D.C. Cir. 1983) (en banc), which, on the strength of *Marsh*, dismissed a challenge to paid Congressional chaplains as not presenting a substantial federal question.  The Speaker cites the record presented to the appellate court, which showed some explicitly Christian prayers.  The appellate court, however, did not address the content of the prayers in its opinion.

From this history, the Speaker concludes that "*Marsh* permits non-proselytizing sectarian legislative prayers."  Def. Br. at 19.  The fact remains,

however, that the Speaker and the *amici* have not pointed to any court decisions actually addressing and upholding a practice of sectarian legislative prayers. Certainly no court decision upholds a practice of legislative prayers so consistently and systematically sectarian as that shown by the evidence in this case.  Even *Newdow v. Bush* reflected only a preliminary decision offering a host of alternative grounds, and the court's opinion acknowledged how problematic sectarian prayers can be.  See 355 F. Supp. 2d at 288-90.

Both *Marsh v. Chambers* and *Simpson v. Chesterfield County* upheld prayer practices only after noting that references to the resurrection and divinity of Jesus of Nazareth had been removed.  463 U.S. at 793 n.14; 404 F.3d at 279 & n.1.  It is therefore telling that the Speaker, in support of this argument, must try to dismiss as merely "an offhand footnote" the Supreme Court's statement in *Marsh* that all references to Christ had been removed from the legislative prayers it was approving.  Def. Br. at 20, citing 463 U.S. at 793 n.14.  The Speaker also treats as "offhand" remarks the *Allegheny County* Court's explanation that *Marsh* rejected "contemporary legislative prayers that have the effect of affiliating the government with any one specific faith or belief" and that the prayers in *Marsh* were permissible "because the particular chaplain had 'removed all references to Christ.'"  Def. Br. at 20, citing 492 U.S. at 603.  With all due respect, this court simply cannot treat such statements by the Supreme Court of the United States, in opinions joined by a majority of the Court, as "offhand" remarks.

By relying on the Christian character of some past and relatively recent legislative prayer practices, the Speaker and the *amici* argue in effect that the Supreme Court and other courts have intended to endorse explicitly Christian official prayers, but apparently have not quite been willing to say so in so many words.  To accept this argument, one would have to close one's eyes to this critical aspect of the *Marsh* Court's reasoning.   In fact, when courts have directly confronted established practices of sectarian prayers, they have struck down the practice, as in the *Great Falls*, *Palo Verde*, and *Burbank* cases.[14]  And when courts have upheld prayer practices, they have relied on the non-sectarian character of the prayers.  See *Chesterfield County*, 404 F.3d at 284 (distinguishing *Great Fall*'s sectarian prayers from the Chesterfield County prayers that "aspired to non-sectarianism").

---

[14]See also *Coles v. Cleveland Board of Education*, 950 F. Supp. 1337 (N.D. Ohio 1996), in which the district court held that a school board's practice of opening meetings with prayers did not violate the Establishment Clause.  The district court's opinion quoted only one non-sectarian prayer and otherwise did not address the contents of the prayers.  *Id.* at 1338-39.  After describing the evidence in more detail, however, the Sixth Circuit reversed, noting that the prayers were "clearly sectarian, with repeated references to Jesus and the Bible," as well as the fact that the school board president was a Christian minister who personally delivered the majority of the prayers.  171 F.3d 369, 385 (6th Cir. 1999), rehearing en banc denied, 183 F.3d 538 (6th Cir. 1999).  Although Jewish and Muslim clergy were invited occasionally to offer the prayer, as in the Indiana House, see 950 F. Supp. at 1339, the Sixth Circuit said that "any reasonable observer would conclude that the school board was endorsing Christianity."  171 F.3d at 385.

2. *All Prayer is Sectarian?*

The Speaker also argues that the court should deny relief to plaintiffs because essentially "*all* prayers 'advance' a particular faith or belief in one way or another."  Def. Br. at 23, quoting *Snyder v. Murray City Corp.*, 159 F.3d at 1234 n.10 (emphasis added by defendant).  The Speaker contends that the court therefore cannot draw a principled line between sectarian and non-sectarian prayer, and should not "embark on a sensitive evaluation or . . . parse the content of a particular prayer."  See *Marsh*, 463 U.S. at 795.

In effect, the Speaker argues that all prayers are inherently sectarian because they  reflect some religious viewpoint that not all listeners or citizens will share.  Many religious traditions in the United States and in the world do not share the concept of divinity reflected in even the most inclusive public prayers.  Even a relatively inclusive prayer in the Judeo-Christian tradition presupposes one God who is generally thought to be omniscient, omnipotent, benevolent, and responsive to prayer.  Consider, for example, the debate in *McCreary County v. American Civil Liberties Union of Kentucky*, 125 S. Ct. 2722 (2005), in which the dissent argued that the Establishment Clause allows the government to embrace the common ground of the principal monotheistic religions in the United States – Judaism, Christianity, and Islam – while the majority argued that the Establishment Clause does not allow government to favor those religious traditions over others.  See 125 S. Ct. at 2744-45 (majority opinion), and *id.* at 2752-53 (Scalia, J., dissenting); see also *Lee v. Weisman*, 505 U.S. at 641 (Scalia,

J., dissenting) (arguing that non-denominational prayer offered by rabbi was permissible at public high school graduation, but acknowledging that government-sponsored endorsement of religion is not permissible "where the endorsement is sectarian, in the sense of specifying details upon which men and women who believe in a benevolent, omnipotent Creator and Ruler of the world are known to differ (for example, the divinity of Christ)").

The Speaker's assertion that all prayer has some significant denominational and/or theological content has considerable force.   Justice Brennan made the same point in his dissenting opinion in *Marsh*:

> More fundamentally, however, any practice of legislative prayer, even if it might look "non-sectarian" to nine Justices of the Supreme Court, will inevitably and continuously involve the state in one or another religious debate.  Prayer is serious business – serious theological business – and it is not a mere "acknowledgment of beliefs widely held among the people of this country" for the State to immerse itself in that business.   Some religious individuals or groups find it theologically problematic to engage in joint religious exercises predominantly influenced by faiths not their own. Some might object even to the attempt to fashion a "non-sectarian" prayer. Some would find it impossible to participate in any "prayer opportunity," *ante,* at 794, marked by Trinitarian references.  Some would find a prayer *not* invoking the name of Christ to represent a flawed view of the relationship between human beings and God.   Some might find any petitionary prayer to be improper.  Some might find any prayer that lacked a petitionary element to be deficient.  Some might be troubled by what they consider shallow public prayer, or non-spontaneous prayer, or prayer without adequate spiritual preparation or concentration.  Some might, of course, have *theological* objections to any prayer sponsored by an organ of government.   Some might object on theological grounds to the level of political neutrality generally expected of government-sponsored invocational prayer.   And some might object on theological grounds to the Court's requirement, *ante,* at 795, that prayer, even though religious, not be proselytizing.

463 U.S. at 819-21 (emphases in original).  This quoted passage contains fourteen footnotes that support and illuminate these points.  On the issue of whether public prayer is even appropriate at all from a Christian viewpoint, for example, Justice Brennan quoted a portion of this passage from the Sermon on the Mount in the Gospel of Matthew, which has been translated more recently as follows:

> And when you pray, don't act like phonies.  They love to stand up and pray in houses of worship and on street corners, so they can show off in public.  I swear to you, their prayers have been answered!  When you pray, go into a room by yourself and shut the door behind you.  Then pray to your Father, the hidden one.  And your Father, with his eye for the hidden, will applaud you.  And when you pray, do not babble on as the pagans do.  They imagine that the length of their prayers will command attention.  So don't imitate them.  After all, your Father knows what you need before you ask.

Matthew 6:5-8 (Scholars Version).  Justice Brennan continued:  "it is simply beyond the competence of government, and inconsistent with our conceptions of liberty, for the state to take upon itself the role of ecclesiastical arbiter."  463 U.S. at 821.  The force of the point is plain.  Every court that has tried to apply *Marsh v. Chambers* has been sensitive to the possibility that having courts draw lines between permissible and impermissible prayer practices poses a risk of entangling the judiciary in matters of religious faith and practice.

From the premise that he shares with Justice Brennan, however, the Speaker reaches a very different conclusion.  Justice Brennan concluded that the practice of legislative prayer was so problematic for this and other reasons that it could not be reconciled with the Establishment Clause.  Speaker Bosma concludes that the task of distinguishing between permissible and impermissible

legislative prayer is so problematic that the courts should allow any form of legislative prayer that a legislative majority chooses to allow.

In other words, under the Speaker's view, *Marsh v. Chambers* imposes no limits on legislative prayer, apart perhaps from intentional discrimination in the selection of volunteer clergy from different religious faiths.  At the hearing, the court invited the Speaker's attorney to identify prayers that he would view as outside the boundaries permitted by *Marsh*.  Counsel repeatedly declined, apart from saying that attempts at conversion should not be permitted.[15]  If courts should not try to draw lines under *Marsh*, then even prayers explicitly hostile and demeaning to other faiths would have to be permitted.  It is unlikely, of course, that prayers hostile or demeaning to a majority's faith would be offered under the Indiana House's practices, but one purpose of the Establishment Clause is to protect religious minorities from majorities.  See, *e.g.*, *Santa Fe Independent School District v. Doe*, 530 U.S. at 304 (subjecting decisions about student-led prayer at high school football games to majority vote by students "guarantees, by definition, that minority candidates will never prevail and that their views will be effectively silenced"), citing *Board of Regents of Univ. of Wisconsin System v. Southworth*, 529 U.S. 217 (2000); *Engel v. Vitale*, 370 U.S. 421, 433 (1962) (explaining that Establishment Clause was introduced "in large part" to avoid systematic religious persecution of religious minorities experienced elsewhere).

---

[15]Counsel argued, however, that it would be "fine" for a Christian pastor to pray based on the passage from John 14:6:  "I am the way, and the truth and the life.  No one comes to the Father except through me."  Hearing Tr. at 34.

While the boundary between permissible and impermissible legislative prayer may not be precise in every detail, three points are clear.  First, the powerful argument articulated by both the Speaker and Justice Brennan remains a dissenting view.  This district court must apply the principles adopted by the majority in *Marsh v. Chambers*.  Second, the Supreme Court has assumed and acknowledged that a boundary does exist between on the one hand exclusive and sectarian prayer that is not permissible in this official governmental context, and on the other hand the well established tradition of inclusive and non-sectarian prayer in such public settings.  That boundary is the foundation of *Marsh v. Chambers* itself, as well as the many cases applying *Marsh*.  The boundary was also discussed at some length in *Lee v. Weisman*, 505 U.S. at 589, in which the Court rejected a contention that non-sectarian prayers should be permitted at public high school graduation ceremonies, and also in *Allegheny County*, 492 U.S. at 603-04 (majority), and at 630-31 (O'Connor, J., concurring).

Third, the current legislative prayer practices of the Indiana House, as shown by evidence from the 2005 session and when viewed as a whole, are well outside the boundaries established by the Supreme Court in *Marsh v. Chambers*. A substantial majority of the prayers were explicitly Christian, offered in the name of Jesus Christ or with similar phrasing.  Several used repeated references to specifically Christian beliefs and doctrine, and some can fairly be described as proselytizing efforts.  See, *e.g.*, February 28th, March 28th and April 29th, quoted

above at pages 6-9.  On the whole, the legislative prayers were used to advance the Christian religion.

Courts that have enforced the *Marsh* limits with injunctions have done so by prohibiting sectarian prayer.  See *Great Falls*, 376 F.3d at 296 (affirming injunction that enjoined town council from "invoking the name of a specific deity associated with any one specific faith or belief"); *Palo Verde*, 52 Fed. Appx. at 357 (reversing denial of injunction because "[s]olemnizing school board meetings 'in the Name of Jesus' displays 'the government's allegiance to a particular sect or creed'"); *Burbank*, 124 Cal. Rptr. 2d at 868 (affirming injunction requiring city to "advise anyone conducting a prayer as part of the City Council meeting that sectarian prayers are not permitted").

The official policy in *Chesterfield County* stated that each "invocation must be non-sectarian with elements of the American civil religion and must not be used to proselytize or advance any one faith or belief or to disparage any other faith or belief."  404 F.3d at 278.  The letters sent to invited clergy directed them "to avoid invoking the name of Jesus Christ," a practice that some Christian clergy had followed in the past.  *Id.* at 279.  These guidelines were sufficient to keep the practice within the *Marsh* boundaries in *Chesterfield County*, and they should be sufficient in this instance.  The practice of non-sectarian public prayer is well established and familiar in public life.  Close questions may arise if someone

wishes to test the precise boundaries.  If that happens, the court will address them.

The Speaker has also suggested that such an explicit caution about Christian references "would be the first known religious viewpoint discrimination in connection with the Indiana House invocation." Def. Br. at 34.  The criticism is misguided.  The decisive point of constitutional law is that a practice of sectarian prayer favoring *any* particular religion violates the Establishment Clause.  From the evidence here, it is clear that the letters asking invited clerics to "strive for an ecumenical prayer" have not been sufficient to prevent many Christian speakers from using the prayer opportunity to advance and even to proselytize Christianity.  The same strictures will apply to sectarian Jewish or Muslim prayers, for example.  This record, however, shows no efforts by Jewish or Muslim clerics to use the prayer opportunity to advance their particular religions.  At this juncture, there is no need to be more specific in the injunction as to what would amount to a sectarian prayer in those traditions.[16]

As a variation on this argument, the Speaker contends that requiring the inclusive, non-sectarian prayers the plaintiffs say they find acceptable would in fact amount to government adoption of a particular religious viewpoint, one that

---

[16]Clerics of religious minorities often have substantial experience in getting along with a majority who believes differently and in avoiding giving offense to that majority in a public setting.  Perhaps it is not mere coincidence that the only transcribed prayer in the 2005 session from someone outside the Christian religion, that of the imam, was inclusive and non-sectarian. See Jt. Ex. 23 at 8-9.

reflects the plaintiffs' beliefs and emphasizes the tolerance and inclusiveness of their Christian faiths, as opposed to the unique chosen status stressed by other believers.  The Jewish and Christian religious traditions have competing elements of both inclusive tolerance that welcomes outsiders, as well as exclusive claims to a unique relationship with God.[17]

The argument is supported here by evidence from several Christian clergy who testify that they could not offer prayers in the House in good conscience if they are not permitted to pray in the name of Jesus Christ.  Under *Marsh*, of course, no individual or sect has a right to insist on access to the official governmental platform to offer prayer, and the Constitution does not require any legislative prayer.  Nevertheless, the prospect that some might feel excluded by a requirement that any prayer be non-sectarian deserves consideration.

---

[17]In the Jewish tradition, for example, in the Book of Ruth which an outsider is welcomed into the tribe and its covenant with God, and she becomes the great-grandmother of King David.  Compare chapters 9 and 10 of the Book of Ezra, which describe a purification of the nation by sending away foreign wives and their children.  In the Christian tradition, for example, John 3:18 offers this vision of Judgment Day:  "Those who believe in [God's Son] are not condemned; but those who do not believe are condemned already, because they have not believed the name of the only Son of God."  Compare the account of Judgment Day in Matthew 25:31-46, in which those who fed the hungry, gave drink to the thirsty, welcomed strangers, clothed the naked, took care of the sick, and visited prisoners are called righteous and are welcome in God's Kingdom:  "Truly I tell you, just as you did it to one of the least of these who are members of my family, you did it to me."  Matthew 25:40.  See also the many Gospel accounts of Jesus reaching out to Samaritans, tax collectors, prostitutes, Roman soldiers, lepers, and other outsiders.

This district court must apply the principles and boundaries established by the Supreme Court majority in *Marsh v. Chambers*. That decision chose not to follow the logic of the Speaker's and Justice Brennan's argument, which would have led to a decision prohibiting the practice of legislative prayer altogether. The Court majority instead recognized the long established practice of non-sectarian public prayer in this country reflecting "beliefs widely [but not universally] held among the people of this country." *Marsh*, 463 U.S. at 792. The Court followed the example of Samuel Adams. As a member of the Continental Congress in 1774, Adams was willing to hear prayers from a cleric of a Christian Protestant denomination different from his own. He said "he was no bigot, and could hear a prayer from a gentleman of piety and virtue, who was at the same time a friend to his country." 463 U.S. at 792.

One of the most eloquent statements of this room for inclusive, non-sectarian prayer in American public life comes from Judge Wilkinson in *Simpson v. Chesterfield County*:

> In seeking to invalidate the Chesterfield system, Simpson effectively denies the ecumenical potential of legislative invocations, and ignores *Marsh*'s insight that ministers of any given faith can appeal beyond their own adherents. Indeed, *Marsh* requires that a divine appeal be wide-ranging, tying its legitimacy to common religious ground. See *Marsh*, 463 U.S. at 786, 792. Invocations across our country have been capable of transcending denominational boundaries and appealing broadly to the aspirations of all citizens. As *Marsh* and other cases recognize, appropriately ecumenical invocations can be "solemnizing occasions" that highlight "beliefs widely held." See, *e.g., Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 124 S. Ct. 2301, 2322, 159 L. Ed. 2d 98 (2004) (O'Connor, J., concurring in judgment); *Allegheny*, 492 U.S. at 625

(O'Connor, J., concurring in part); *Lynch*, 465 U.S. at 693 (O'Connor, J., concurring).

We cannot adopt a view of the tradition of legislative prayer that chops up American citizens on public occasions into representatives of one sect and one sect only, whether Christian, Jewish, or Wiccan.  In private observances, the faithful surely choose to express the unique aspects of their creeds.  But in their civic faith, Americans have reached more broadly.  Our civic faith seeks guidance that is not the property of any sect.  To ban all manifestations of this faith would needlessly transform and devitalize the very nature of our culture.  When we gather as Americans, we do not abandon all expressions of religious faith.  Instead, our expressions evoke common and inclusive themes and forswear, as Chesterfield has done, the forbidding character of sectarian invocations.

404 F.3d at 287.

There are three solutions to the problem the Speaker has raised in terms of the inherently sectarian content of any prayer.  The first would be to find that all religious prayer in this context (official speech as part of the formal legislative proceedings) violates the Establishment Clause.  That was the approach of Justices Brennan and Marshall in dissent in *Marsh*.  The second is to find that the problem is not really a problem, so that legislative prayers based on inclusion and common traditions are permissible under the Establishment Clause.  That was the approach of the Court majority in *Marsh*, and that is the approach this court must follow.  The third would be to find that courts should not try to distinguish between permissible and impermissible prayer in this context, and so should permit any legislative prayer, no matter how sectarian, divisive, exclusive, or even hostile to other faiths it might be.  That is the approach advocated by the Speaker, but no court has adopted it.

The court recognizes that the relief granted in this case might make it difficult or even impossible for some clergy or believers to offer official prayers. All are free to pray as they wish in their own houses of worship or in other settings. The individuals do not have a First Amendment right, however, to use an *official* platform like the Speaker's podium at the opening of a House session to express their own religious faiths. Those who wish to participate in a practice of official prayer must be willing to stay within constitutional bounds, as spelled out in *Marsh* and its progeny. The alternative under the Constitution would be a complete prohibition on legislative prayer.

### 3.   *All Are Welcome?*

Finally, the Speaker argues that the House's prayer practices should be permitted under the Establishment Clause because the podium is available to clergy and House members of different faiths, and because the Speaker does not monitor or supervise the content of the prayers that are offered (and apparently does not want to do so). "The Indiana House system does not require policing for 'sectarianism' or other religious advancements or affiliations because the Speaker invites clerics of all creeds and thereby avoids any reasonable inference that any single faith represents an official government viewpoint, no matter what deity may be invoked." Def. Br. at 31. This approach, the Speaker argues, recognizes other First Amendment values such as free speech and free exercise of religion.

The argument may have some superficial appeal.  Upon close examination, however, it has essentially no support in First Amendment values, principles, or jurisprudence.  The Speaker seems to be suggesting that the podium in the House of Representatives is a species of public forum (limited, public, or non-public), available for expressions of many viewpoints on the subject of religious prayer before the legislature.  See, *e.g.*, *Rosenberger v. University of Virginia*, 515 U.S. 819, 829-31 (1995) (university funding of student publications established limited forum from which religious viewpoints could not be excluded).

In fact, though, the Speaker has no intention of opening up the podium to all comers.  As noted earlier, his reluctance is understandable.  If the Speaker really wished to create an open forum for the House invocations, he would be unable to impose any restrictions on content, including attacks on the beliefs of many members.  When a government establishes a public forum, it cannot restrict any viewpoints, no matter how offensive or disruptive they might be.  See, *e.g.*, *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995) (Ku Klux Klan had First Amendment right to display cross in public square outside state capitol); cf. *Snyder v. Murray City Corp.*, 159 F.3d at 1236 (allowing city council to exclude citizen who wished to offer prayer asking for divine guidance to public officials to bar official prayer from public meetings).

The Speaker's argument is fundamentally at odds with the fact that the House prayers are government speech, as he concedes.  The prayers said from the

podium are given with the Speaker's permission, whether he chooses to monitor the content or not.   They reflect government speech, not private speech, a fundamental distinction in First Amendment law.  See *Lee v. Weisman*, 505 U.S. at 587 (prayers at high school graduation ceremony were government speech and subject to Establishment Clause scrutiny).  If the House and its Speaker choose to continue the practice of opening prayers, they will need to comply with their obligations to avoid government speech that endorses or advances a particular sect and its beliefs, however widespread those beliefs may be among the House membership or its constituency of Indiana citizens.

In a variation on this argument, the Speaker contends that having prayers offered by volunteers from different religious traditions protects against any inference of government advancement or endorsement of any particular religion. He also suggests that *Marsh* itself and the *Great Falls* case should be distinguished on this basis because they both dealt with practices in which one person led virtually all prayers.  The Speaker also points to the fact that out of the 53 prayers offered during the 2005 session, one was by a Jewish rabbi and one by a Muslim imam.

The first problem with this argument is that the focus of the Establishment Clause is on the content of the government speech, not the identity of the person speaking.  The courts in *Marsh*, *Great Falls*, *Chesterfield County*, *Palo Verde*, and *City of Burbank* all focused on the content of the prayers.  The decision to uphold

the practice in *Chesterfield County* was based on the inclusive and non-sectarian content of the prayers.  404 F.3d at 282-84.  The court did not imply that sectarian prayers offered through an open selection system could survive Establishment Clause scrutiny.  As Judge Wilkinson wrote:  "Indeed, *Marsh* requires that a divine appeal be wide-ranging, tying its legitimacy to common religious ground."  *Id.* at 287, citing *Marsh*, 463 U.S. at 786, 792.

The second problem with the Speaker's reliance on an open selection system is that the evidence here shows that the practice produced prayers that were overwhelmingly Christian in content, though with some inclusive and non-sectarian prayers sprinkled among them.  The effect, in other words, of the Speaker's selection method was that the prayers were used to advance a particular religion.  It is not surprising that the effect was a pattern of prayers reflecting the religious beliefs of a majority.  The point of access for giving such prayers, after all, is through a member of the House who has won a general election. It bears repeating, though, that the Establishment Clause was intended in large part to protect religious minorities from religious majorities who might try to harness the power and prestige of the government to advance their sincere religious beliefs.[18]

---

[18]Also, the Speaker's focus on the cleric selection process seems to invite some undefined system of quotas or government-supervised balance among different religious traditions, a remedy that would be far more intrusive than an injunction against official sectarian prayer.

Many Christian clergy, including several who led the House in prayer during the 2005 session, have submitted a brief as friends of the court. Their brief includes a wealth of historical information that has helped the court better understand the issues and the background against which this particular case has arisen.

The *amici* clergy acknowledge the explicitly Christian character of many of the prayers. They do not shy away from a conclusion that the prayers ultimately reflect an endorsement or advancement of Christian belief. The *amici* argue in essence that such endorsement occurs and is appropriate: "In order for the prayers to serve their proper solemnizing function, they must, of course, be meaningful to the vast majority of the Indiana House of Representatives." Brief of *Amici Curiae*, Docket No. 24, at 15. The fact that most prayers are Christian, say the *amici*, "merely reflects the makeup of the House, which is appropriate. The House is regularly elected by the people and so by design reflects the nature of the American public, of which the great majority continues to identify itself as Christian. * * * The fact that many prayers reflect a Christian viewpoint on approaching God simply means that the invocations will be meaningful to a majority of the Representatives and will thus fulfill the intended solemnizing purpose." *Id.*

With all respect for the religious faiths of the *amici*, their legal argument runs contrary to *Marsh v. Chambers* and its choice to permit non-sectarian prayer

in that common ground shared by many faiths.  The legal argument seeks to convert *Marsh* instead into an opportunity for the religious majority to express and advance its religious faith with the endorsement of the government – precisely *because* it is the religious majority.  That reasoning runs counter to the logic of *Marsh* in particular and the Establishment Clause in general.  No court decision has endorsed expressly sectarian Christian prayer in an official setting like the Indiana House.  Such a decision would reflect a marked departure from the reasoning of *Marsh* and its well-reasoned progeny in the *Great Falls*, *Chesterfield County*, *Palo Verde*, and *Burbank* cases.

As Judge Wilkinson wrote for the Fourth Circuit:  "When we gather as Americans, we do not abandon all expressions of religious faith.  Instead, our expressions evoke common and inclusive themes and forswear, as Chesterfield [County] has done, the forbidding character of sectarian invocations." *Chesterfield County*, 404 F.3d at 287.  Unlike Chesterfield County, Virginia, the Indiana House has not forsworn sectarian invocations, but has as a practical matter invited and even encouraged them.  The practice of the Indiana House shown by the evidence here amounts in practical terms to an official endorsement of the Christian religion and violates the Establishment Clause.

### Conclusion

When the Founders of this Nation set the boundaries on the power of government, the first words they wrote in the Bill of Rights were "Congress shall

make no law respecting an establishment of religion . . . ."  The Founders recognized that we are a people of many strong and vigorous faiths.  They acted to protect the liberty to practice those faiths.  The Founders also knew centuries of history in which religious conflicts had caused war and oppression.  They recognized that even the best intentions of people of faith can lead to division, exclusion, and worse.  And they recognized that a majority who sees its faith as true and benign can be tempted in a democratic republic to try to use the power and prestige of government to advance that faith in ways that would actually divide and exclude.

All of us who have inherited the liberties of the religion clauses of the First Amendment continue to elaborate on their meaning and application one case at a time.  In this case, for the reasons set forth above, plaintiffs are entitled to a permanent injunction against the Speaker in his official capacity barring him from permitting sectarian prayer as part of the official proceedings of the Indiana House of Representatives.  If the Speaker chooses to continue any form of legislative prayer, he shall advise persons offering such a prayer (a) that it must be non-sectarian and must not be used to proselytize or advance any one faith or belief or to disparage any other faith or belief, and (b) that they should refrain from using Christ's name or title or any other denominational appeal.  See *Simpson v. Chesterfield County*, 404 F.3d at 278-79, 284.

The court shall issue a permanent injunction accordingly.

So ordered.

Date: November 30, 2005

_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Kenneth J. Falk
INDIANA CIVIL LIBERTIES UNION
ken.falk@iclu.org

Thomas M. Fisher
INDIANA STATE ATTORNEY GENERAL
tfisher@atg.state.in.us

Anita Y. Woudenberg
James Bopp, Jr.
Richard E. Coleson
BOPP, COLESON & BOSTROM
awoudenberg@bopplaw.com
jboppjr@aol.com
rcoleson@bopplaw.com