UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ANTHONY HINRICHS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | CASE NO. 1:05-cv-0813-DFH-TAB |
| BRIAN BOSMA, in his official capacity | ) | |
| as Speaker of the House of | ) | |
| Representatives of the Indiana | ) | |
| General Assembly, | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON POST-JUDGMENT MOTIONS

On November 30, 2005, the court entered a final judgment and permanent injunction ordering the Speaker of the Indiana House of Representatives not to permit sectarian prayers as part of the official proceedings of the House. *Hinrichs v. Bosma*, — F. Supp. 2d —, 2005 WL 3263883 (S.D. Ind. Nov. 30, 2005). As explained in detail in the court's findings of fact and conclusions of law, the court found that the Speaker's practices toward the House's opening prayer had resulted in prayers that repeatedly and consistently advanced the Christian religion, in violation of the Establishment Clause of the First Amendment. The sectarian content of the substantial majority of official prayers took the prayers outside the safe harbor the Supreme Court recognized for inclusive, non-sectarian legislative prayers in *Marsh v. Chambers*, 463 U.S. 783 (1983). The court also

found that the four plaintiffs had standing as taxpayers to challenge the prayer practices advancing the Christian religion.

The Speaker has filed two post-judgment motions, one seeking to alter or amend the judgment and the second seeking a stay of the injunction pending disposition of the first motion.  Plaintiffs have responded, and the motions are now ripe for decision.  As explained below, both motions are denied.  This entry assumes familiarity with the court's findings of fact and conclusions of law.

I.      *Motion to Alter or Amend*

    A.      *Enjoining the Unconstitutional Practice*

After the trial on the merits in this case on October 28, 2005, the Indiana Friends Committee on Legislation fired plaintiff Anthony Hinrichs from his job as a lobbyist.  Plaintiffs then limited their claim of standing to their standing as state taxpayers whose funds were being misused to pay the costs of an unconstitutional practice.  The Speaker argues that the court should not have enjoined sectarian prayer but instead should have limited the remedy to an injunction against the expenditure of public funds on the sectarian prayers.

The taxpayer-plaintiffs have proved that the Speaker's practice toward the official prayers used to open the House sessions amounts to an unconstitutional endorsement of the Christian religion.  The practice is unconstitutional whether

-2-

public funds are used or not.  The Speaker is arguing in effect that the court should give him the choice between either (a) modifying the prayer practice to bring it within constitutional bounds, or (b) eliminating the public spending but continuing the unconstitutional pattern of sectarian Christian prayers.[1]

To describe the alternatives is to answer the question.  The taxpayer plaintiffs have standing because of the public expenditures, but the law authorizes the court to order an end to the unconstitutional practice.  The injury that gives the taxpayer-plaintiffs standing is the misuse of the public funds into which they pay their taxes.  *E.g.*, *Doe v. Madison School District*, 177 F.3d 789, 797 (9th Cir. 1999) ("Taxpayer standing protects against only one type of injury, namely, the 'misuse of public funds.'"), quoting *Fuller v. Volk*, 351 F.2d 323, 327 (3d Cir. 1965); see also *Freedom From Religion Foundation, Inc. v. Bugher*, 249 F.3d 606, 610 (7th Cir. 2001) (affirming finding that state taxpayers had standing to challenge state grants to religious schools); *Minnesota Federation of Teachers v. Randall*, 891 F.2d 1354, 1358 (8th Cir. 1989) (reversing finding that taxpayer lacked standing:  "state taxpayers need only show that there has been a disbursement of tax money in potential violation of constitutional guarantees").

In taxpayer standing cases, the injury to the plaintiff may be remedied by enjoining the expenditure of public funds but may also be remedied by enjoining

---

[1]The court's injunction gives the Speaker and the House a choice between two *constitutional* alternatives:  eliminating all official prayer in the House and eliminating only sectarian official prayers that advance a particular religion.

the unconstitutional practice, especially where the constitutional issues do not depend on the expenditure of public funds.  The Seventh Circuit has rejected the Speaker's argument that equitable relief in an Establishment Clause case like this must be limited to address only the injury that supports the plaintiff's standing, without reaching the unconstitutional practice itself.  In *American Civil Liberties Union of Illinois v. City of St. Charles*, 794 F.2d 265, 274-75 (7th Cir. 1986), the Seventh Circuit affirmed a preliminary injunction against display of a lighted cross on a government building during the Christmas season.  The principal plaintiff had standing because she testified that she altered her route to work by a couple of blocks to avoid seeing the official use of the Christian symbol.  *Id.* at 269, 274.

When deciding whether the injunction was appropriate, the Seventh Circuit explained that the district court should consider the larger public interest at stake, beyond the individual plaintiff's injury sufficient for standing:

> We conclude that in considering whether the plaintiff in a case under the establishment clause has shown irreparable harm, and how much, the court is not confined to the particular harm on which the plaintiff's standing to sue is based; it can consider the effect of the defendant's conduct on the interests protected by the clause if the injunction is not granted. * * * The trivial inconvenience suffered by one of the plaintiffs is only a small fraction of the potential harm inflicted by the defendants' alleged violation of the establishment clause.

*Id.* at 275.  The Seventh Circuit affirmed an injunction that remedied those broader harms resulting from the violation of the Establishment Clause.  Similarly here, after the plaintiffs had shown their standing, the court's decision on the scope of the remedy had to consider not only the plaintiffs' standing but also the

-4-

larger public interests protected by the Establishment Clause.  A remedy effective to prevent the constitutional violation is entirely appropriate.

That conclusion draws further support from the reference in *City of St. Charles* to the standing issues in *Lynch v. Donnelly*, 465 U.S. 668 (1984).  See 794 F.2d at 274.  In *Lynch v. Donnelly*, plaintiffs challenged a municipal holiday display that included a scene depicting the birth of Jesus.  Standing was based on taxpayer standing where the evidence showed that the city spent about $20 per year on the challenged Nativity scene.  See *Donnelly v. Lynch*, 525 F. Supp. 1150, 1162 (D.R.I. 1981) (plaintiffs who actually paid their local taxes had standing), *id.* at 1156 (noting estimated costs of $20 per year attributable to creche), *aff'd*, 691 F.2d 1029,1030-32 (1st Cir. 1982), *rev'd on merits*, 465 U.S. 668 (1984).  In *Donnelly*, the district court and the First Circuit both found taxpayer standing based on expenditures even more modest than those in this case.  The Supreme Court accepted that finding and decided the case on the merits.  If the Speaker's argument about the limits of relief were correct, then the district court and First Circuit should not have enjoined the public display of the city-owned Nativity scene.  They should have enjoined instead only the expenditure of public funds, so that private contributions and volunteer labor could have enabled the official religious display to continue.  Those courts did not issue such narrow relief.  They addressed instead the larger harm caused by what they found to be a violation of the Establishment Clause, as did the district court and Seventh Circuit in *City of St. Charles*.  This court has taken a similar approach in this case.

The cases cited by the Speaker do not hold that the remedy in a taxpayer Establishment Clause case must be limited to enjoining expenditures while unconstitutional practices go forward with other sources of funds. *Doe v. Madison School District*, 177 F.3d at 793-97, does not hold or even say that relief must be limited to the plaintiff's injury as a taxpayer; the case held that the plaintiffs lacked standing. *District of Columbia Common Cause v. District of Columbia*, 858 F.2d 1, 5-9 (D.C. Cir. 1988), also did not hold or say that relief must be limited to addressing the plaintiff's injury as a taxpayer. The case held that taxpayers must show that their injury can be remedied by the relief they seek, as the taxpayers in that case proved. Also, the substantive claim in *Common Cause* was that the local government had spent funds without appropriation authority from Congress. The alleged wrong itself was limited to the use of public funds, unlike this case, where the challenged practice is unconstitutional whether public funds are spent on it or not.

The Speaker has also cited *Arakaki v. Lingle*, 299 F. Supp. 2d 1114, 1123 (D. Haw. 2003), *aff'd in part and rev'd in part*, 423 F.3d 954 (9th Cir. 2005), where the district court found no taxpayer standing to challenge state programs to benefit Native Hawaiians where plaintiffs could not show state expenditures on the challenged practices. The district court suggested in dicta that relief in such cases might be limited to enjoining the expenditure of public funds rather than the underlying practice. 299 F. Supp. 2d at 1123. That comment came in a discussion of a Ninth Circuit case that found taxpayer standing to challenge a

public school curriculum as religious and that did not address the scope of available remedies.  See *PLANS, Inc. v. Sacramento City Unified School District*, 319 F.3d 504 (9th Cir. 2003) (reversing dismissal for lack of standing).  The district court's comments in *Arakaki* would not apply in cases like this one, where the challenged government practice is unconstitutional regardless of whether public expenditures can be traced to the practice.  Also, the limit suggested in dicta is inconsistent with Seventh Circuit law.  Accordingly, the court denies the Speaker's request to limit the injunction so narrowly that the unconstitutional practice could continue.

B.    *The Scope of the Injunction*

The Speaker raises two related challenges to the terms of the injunction.  First, he contends that the court should have limited the injunction to opening prayers rather than reaching any official House prayers.  Second, he contends that the injunction is not sufficiently specific, and he raises a number of hypothetical questions that might arise.  The issues are related, for they both implicate the effectiveness of the injunction and the potential for evasion.

The plaintiffs challenged the House's practice of official prayers conducted under House Rule 10, which calls for a prayer after the Speaker calls the House to order and before the Pledge of Allegiance.  As noted, plaintiffs showed that the practice of inviting clergy or House members to offer the prayer has produced a pattern of sectarian and exclusionary Christian prayers.  If the court had limited

the injunction to prayers offered pursuant to House Rule 10 as it currently exists, the injunction would not have affected, for example, an amended rule that would switch the order of the Pledge of Allegiance and the prayer, or a practice of sectarian prayer at the end of each session instead of the beginning. A practice of overwhelmingly sectarian official prayer would violate the Establishment Clause regardless of exactly when the prayer is offered. The court has the power to grant injunctive relief that will be effective to protect the plaintiffs' interests in compliance with the Constitution.[2]

The Speaker has asked whether the injunction requires him to take any measures with respect to prayers that might be offered by "House members who pray spontaneously during official proceedings for divine guidance during a debate . . . ." Def. Mem. at 7. There is no evidence before the court on whether or how often this occurs. Four points are worth noting. First, as was also the case in *Marsh v. Chambers*, plaintiffs here have not tried to challenge the content of floor debate. See *Marsh*, 463 U.S. at 812-13 (Brennan, J., dissenting); Pl. Trial Br. at 20-22. Second, like any legislative body, the Indiana House has a tradition

---

[2]This conclusion would apply generally to official prayers offered in joint House-Senate sessions in which the Speaker has control over whether and by whom a prayer may be offered. The Speaker has also asked how the injunction might apply to the Governor's oath of office ceremony, which is described as an example of a joint House-Senate session. See Def. Mem. at 6-7. An inaugural ceremony is different from daily legislative sessions and involves parties and issues that were not before this court. See, *e.g.*, *Newdow v. Bush*, 355 F. Supp. 2d 265, 283-90 (D.D.C. 2005) (discussing prayer practices in Presidential inaugurations). The present injunction does not address such inaugural ceremonies, and the court expresses no view on the subject.

of robust debate, though with boundaries such as requiring that members show courtesy and respect toward one another.  The court has no intention to interfere with such debates on legislative business.  Third, the reason the sectarian prayers from the Speaker's podium violate the Constitution is that the person offering the prayer is praying in an official capacity, not merely for himself or herself.  That seems unlikely to be the case if a House member prays "spontaneously" during floor debate.  Fourth, however, if this limit on the scope of the injunction leads to evasion of the injunction, so that the Speaker and the House return to a practice that amounts to official sectarian prayers that endorse or advance a particular religion, the court will be prepared, upon a proper motion, to take appropriate steps to ensure compliance with the Establishment Clause.

The Speaker also contends that the injunction is too vague to give him fair notice of what he is required to do to comply with it.  The injunction orders the Speaker not to permit sectarian prayers and to advise those offering official prayers "(a) that the prayers must be non-sectarian and must not be used to proselytize or advance any one faith or belief or to disparage any other faith or belief, and (b) that the prayers should not use Christ's name or title or any other denominational appeal."  Rule 65(d) of the Federal Rules of Civil Procedure requires that an injunction "shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained."  See also *Schmidt v. Lessard*, 414 U.S. 473, 476-77 (1974) (vacating vague injunction); *Chicago Board of Education v. Substance, Inc.*,

354 F.3d 624, 632 (7th Cir. 2003) (requiring modification of overly broad injunction).  At the same time, Rule 65(d) does not "require the impossible.  There is a limit to what words can convey.  The more specific the order, the more opportunities for evasion."  *Minnesota Mining & Mfg. Co. v. Pribyl*, 259 F.3d 587, 598 (7th Cir. 2001) (affirming injunction in relevant part), quoting *Scandia Down Corp. v. Euroquilt*, 772 F.2d 1423, 1431 (7th Cir. 1985) (affirming contempt finding for violating injunction against "any colorable imitation" of a particular logo).  The injunction here is sufficiently specific.  It gives the Speaker fair notice of what is required, and it need not answer all hypothetical questions that might be imagined.[3]

Nevertheless, because of the larger public interests at stake, as well as in the interests of comity and avoiding unnecessary friction, some of the Speaker's

---

[3]In a case *reversing* a district court finding that a defendant had *not* violated an injunction, the Seventh Circuit explained the relevant considerations:

> We have no quarrel with the general rule that injunctions should be construed narrowly in order to make sure that the persons subject to an injunction have clear notice of what they are prohibited from doing.  We intend no departure from the rule.  But like most legal rules, the rule of strict construction of injunctions should not be pressed to a dryly logical extreme.  If narrow literalism is the rule of interpretation, injunctions will spring loopholes, *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1431 (7th Cir. 1985); cf. *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1547-48 (11th Cir. 1986), and parties in whose favor injunctions run will be inundating courts with requests for modification in an effort to plug the loopholes. It is enough protection for defendants if close questions of interpretation are resolved in the defendant's favor in order to prevent unfair surprise.

*Schering Corp. v. Illinois Antibiotics Co.*, 62 F.3d 903, 906 (7th Cir. 1995).

questions should be answered. The Speaker asks whether the injunction concerning sectarian prayers is limited to "Christian denominations," and "whether denomination in this context refers to Christendom as a whole, or is more limited and means only that there should be no appeals on behalf of Methodism, Presbyterianism, or Roman Catholicism, for example." Def. Mem. at 11-12.

This latter question seems to reflect almost a willful obtuseness. As is evident throughout the opinions of this court and other courts addressing official prayers, official prayers that endorse Christianity in general violate the Establishment Clause. The Establishment Clause is not limited to preferences for particular Christian denominations. The Supreme Court has explained that the Establishment Clause "means at the very least that government may not demonstrate a preference for one particular sect or creed (including a preference for Christianity over other religions). 'The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.'" *County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573, 605 (1989), quoting *Larson v. Valente*, 456 U.S. 228, 244 (1982); see also *Hinrichs v. Bosma*, — F. Supp. 2d —, 2005 WL 3263883, *22 ("The decisive point of constitutional law is that a practice of sectarian prayer favoring *any* particular religion violates the Establishment Clause. . . . The same strictures will apply to sectarian Jewish or Muslim prayers, for example.").

The injunction is not limited to sectarian Christian prayers, either by its terms or by its reasoning. The court focused its findings and conclusions on Christian prayers, of course, because the evidence here shows a pattern of Christian prayer. For the same reason, the court provided more specific guidance in the injunction as to when a prayer is a sectarian Christian prayer. There was no evidence of any prayers that were identifiable as Jewish or Muslim or specific to any other particular religion. The constitutional principles, however, apply to a government endorsement or promotion of *any* religion.[4]

Perhaps most important, the Speaker has asked what the court expects him to do to comply with the injunction: must he review scripts in advance of a prayer, and should he interrupt a prayer that goes too far? The text of the injunction does not require either step, and that silence is deliberate.

With respect to advance review of prayers, the Fourth Circuit explained in *Simpson v. Chesterfield County*, 404 F.3d 276, 287 (4th Cir. 2005), that there is a rich tradition of inclusive non-sectarian prayer in official and public settings in this country. The court and the Speaker can assume that those offering prayers are familiar with that tradition and will be able to offer prayers within that traditional practice.

---

[4]As the court noted in its opinion, the only transcript of a prayer offered by someone not professing the Christian faith during the 2005 legislative session was offered by a Muslim imam. 2005 WL 3263883, *22 n.16. That prayer was an inclusive, non-sectarian prayer that fell squarely within the tradition embraced by the Supreme Court in *Marsh v. Chambers*.

The injunction also does not require the Speaker to secure promises from those offering prayers to offer non-sectarian prayers, whether personally or through aides, and whether in writing or otherwise, nor does it require the Speaker to interrupt a sectarian prayer. That silence in the injunction is also deliberate. The court expects that in this case as in others like it, the good faith of those involved should be sufficient to ensure that the official prayers will not advance a particular religion. Such measures have been both appropriate and sufficient in similar cases. See, *e.g.*, *Simpson*, 404 F.3d at 284 (advice to volunteer clergy was sufficient to keep prayers within *Marsh*'s safe harbor); *Wynne v. Town of Great Falls*, 376 F.3d 292, 296 (4th Cir. 2004) (affirming injunction enjoining town council from "invoking the name of a specific deity associated with any one specific faith or belief" in prayers delivered at council meetings); *Rubin v. City of Burbank*, 124 Cal. Rptr. 2d 867, 869 (Cal. App. 2002) (affirming injunction enjoining city from "knowingly and intentionally allowing sectarian prayer at City Council meetings," and ordering city to "advise anyone conducting a prayer as part of the City Council meeting that sectarian prayers are not permitted").

At the same time, it should be evident that the Speaker's advice will need to be more pointed (as the injunction requires) and more effective than the letters that the Speaker has sent to invited clergy in the past. Those letters asked guests offering prayers only to "strive for an ecumenical prayer" that takes into account the diverse religious beliefs of House members and others present. Those letters

have not been sufficient to avoid a pattern of sectarian prayers advancing the Christian religion.

The court recognizes, of course, that it might be possible to evade the effect of this injunction if the Speaker were to pay mere lip service to the advice requirement and if those offering prayers were to disregard the advice they receive along with the invitation to offer a prayer.  That prospect is likely to be realized, however, only if the Speaker and Members of the Indiana House of Representatives (who have sworn to uphold the Constitutions of the United States and Indiana) and members of the clergy choose a path of deliberate resistance and obstruction toward the court's injunction.  In framing the injunction, the court saw no reason to expect such a response.  The court still sees no reason to expect it.

At the same time, however, if the injunction as presently framed is not sufficient to steer the prayer practices away from the advancement of one particular religion, the court stands ready to modify the injunction as needed to make it more effective.  Such measures could be more intrusive than the present injunction.  The court has continuing jurisdiction to enforce and if necessary to adapt the injunction to changing circumstances.  See, *e.g.*, *Rockwell Graphic Systems, Inc. v. DEV Industries, Inc.*, 91 F.3d 914, 920 (7th Cir. 1996), citing *United States v. Swift & Co.*, 286 U.S. 106, 114-15 (1932); *McCall-Bey v. Franzen*, 777 F.2d 1178, 1183 (7th Cir. 1985); *Duran v. Elrod*, 760 F.2d 756, 758 (7th Cir.

1985).  If stronger and more specific procedural and substantive requirements are needed, the court will impose them, but again, the court expects that should not be necessary.  Also, of course, if the Speaker is concerned about the willingness of those offering prayers to comply with his court-ordered advice, he may want to ensure that he has a solid record that the advice was indeed provided as required.

The Speaker has also asked whether, for example, a Muslim imam may offer a prayer addressed to "Allah."  The Arabic word "Allah" is used for "God" in Arabic translations of Jewish and Christian scriptures.  If those offering prayers in the Indiana House of Representatives choose to use the Arabic Allah, the Spanish Dios, the German Gott, the French Dieu, the Swedish Gud, the Greek Theos, the Hebrew Elohim, the Italian Dio, or any other language's terms in addressing the God who is the focus of the non-sectarian prayers contemplated in *Marsh v. Chambers*, the court sees little risk that the choice of language would advance a particular religion or disparage others.  If and when the prayer practices in the Indiana House of Representatives ever seem to be advancing Islam, an appropriate party can bring the problem to the attention of this or another court.

More generally, the Speaker has asked the court to define more precisely when a prayer is sectarian and when it is not.  What is needed here to comply with Rule 65(d) is not necessarily a theologically comprehensive definition but a pragmatic understanding, one that is "as specific as possible under the totality of the circumstances, such that a reasonable person could understand what conduct

-15-

is proscribed." *United States v. Kaun*, 827 F.2d 1144, 1153 (7th Cir. 1987), quoting *Medtronic, Inc. v. Benda*, 689 F.2d 645, 649 (7th Cir. 1982). And what is most needed here is a pragmatic definition that addresses when prayers are sectarian in a Christian manner, since there is no evidence here of exclusive or sectarian prayers being offered in any other religious tradition.

Prayers are sectarian in the Christian tradition when they proclaim or otherwise communicate the beliefs that Jesus of Nazareth was the Christ, the Messiah, the Son of God, or the Savior, or that he was resurrected, or that he will return on Judgment Day or is otherwise divine. The court will not attempt an exhaustive list of ways of expressing these beliefs. The Christian Bible and Christian traditions in art, music, and literature, and in theology and preaching, abound with different ways of expressing these defining beliefs. Add to these many possibilities the invocation of others, such as prayers asking intercession by Mary or any of a host of other saints in the Christian tradition, and it should be evident that it would be foolish to attempt an exhaustive list or definition. Cf. *Scandia Down*, 772 F.2d at 1432 (affirming contempt finding for violating injunction against "any colorable imitation" of a particular corporate logo; "Rule 65(d) does not require a torrent of words when more words would not produce more enlightenment about what is forbidden").

Nevertheless, the Christian tradition is familiar to most of the audience of the prayers, and to the court. If the Speaker or those offering prayers seek to

evade the injunction through indirect but well understood expressions of specifically Christian beliefs, the audience, the public, and the court will be able to see what is happening.  In that unlikely event, the court will be able to take appropriate measures to enforce the Establishment Clause and the injunction.

For these reasons, the court denies the Speaker's motion to alter or amend the judgment.

II.     *The Motion to Stay*

The Speaker has also asked the court to stay its injunction pending a decision on the Speaker's motion to alter or amend the judgment.  The motion assumed quite reasonably that briefing and decision on that motion might extend into the 2006 session, which is scheduled to begin on January 4, 2006.  Because the court has had an opportunity to decide the motion to alter or amend the judgment, however, the motion to stay is denied as moot.  The injunction remains in effect now.

So ordered.

Date: December 28, 2005

_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Kenneth J. Falk
INDIANA CIVIL LIBERTIES UNION
ken.falk@iclu.org

Thomas M. Fisher
INDIANA STATE ATTORNEY GENERAL
tfisher@atg.state.in.us

Anita Y. Woudenberg
James Bopp, Jr.
Richard E. Coleson
BOPP, COLESON & BOSTROM
awoudenberg@bopplaw.com
jboppjr@aol.com
rcoleson@bopplaw.com